UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| TESSERA, INC., <br><br> Plaintiff, <br><br> v. <br><br> UTAC (TAIWAN) CORPORATION, <br><br> Defendant. | Case No.: 5:10-CV-04435-EJD <br><br> **ORDER GRANTING DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT; DENYING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT** <br><br> **[Re: Docket Nos. 128, 141]** <br><br> **FILED UNDER SEAL** |

Presently before the court in this licensing dispute action are Plaintiff Tessera, Inc.'s ("Tessera") Motion for Partial Summary Judgment, Dkt. No. 128, and Defendant UTAC (Taiwan) Corporation's ("UTC") Motion for Summary Judgment as to Contract Interpretation, Dkt. No. 141. The court held a hearing on these matters on November 8, 2013. Having reviewed the parties' briefing and heard the parties' arguments, the court GRANTS UTC's Motion and DENIES Tessera's Motion.

**I.   Background**

    **a.  Factual Background**

        **i.   The Parties and their Negotiations**

Tessera is a patent holding company and developer of semiconductor packaging technology, which is sometimes referred to as "microBGA technology." Decl. of Joseph M. Lipner ISO Tessera's Mot. Partial Summ. J., Dkt. No. 138 Ex. 1 at 1-2. UTC is a Taiwanese

1

Case No.: 5:10-CV-04435-EJD
ORDER GRANTING DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT;
DENYING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

semiconductor packaging assembler. Id. Ex. 2. In 2001, UTC began manufacturing a small-format ball grid array package, which it called "window BGA" or "wBGA." Dkt. No. 138 Ex. 10 at 24:14-20; Ex. 12. By March 2001, a third party ▮▮▮▮▮ had approached UTC regarding a potential patent infringement claim it believed it had against UTC's wBGA package. Dkt. No. 138 Ex. 9. Shortly thereafter, UTC met with Tessera and raised its concern over a potential patent infringement suit by ▮▮. On April 27, 2001 Tessera's counsel, Christopher Pickett, sent a letter to UTC's President, C.C. Tsai, addressing UTC's concern and particularly noting that, should UTC take a license under Tessera's MicroBGA Technology and patents, and in particular Tessera's U.S Patents 5,950,304 ("the '304 patent") and 6,133,627 ("the '627 patent") ▮▮▮▮▮▮▮▮▮▮ Id. In May 2001, Tessera faxed a license term sheet a draft "TCC License Agreement" to UTC. Dkt. No. 138 Ex. 11.

The parties met in person in Taiwan on June 20, 2001 and August 9, 2001 to discuss terms of the licensing agreement, Tessera's willingness to introduce UTC to potential customers, and the parties' interest in working together on future technology development. Dkt. No. 138 Exs. 12-13. After these meetings, on August 22, 2001, UTC's legal and intellectual property manager Wei-Heng Shan emailed Mr. Pickett to express UTC's willingness to enter into a licensing agreement provided the parties could agree on a licensing fee and royalties. Dkt. No. 138 Ex. 15. ▮▮▮▮▮▮▮▮▮▮▮ Id.

On September 4, 2001, Mr. Shan again sent an email to Mr. Pickett summarizing the key points of UTC's position, ▮▮▮▮▮▮▮▮▮▮▮ Decl. of Dave H. Herrington ISO UTC's Mot. Partial Summ. J., Dkt. No. 142, Ex. 13. ▮▮▮▮▮▮ Id. Three

2
Case No.: 5:10-CV-04435-EJD
ORDER GRANTING DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT;
DENYING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

1   days later, on September 7, 2001, Mr. Pickett emailed Mr. Shan Tessera's TCC License Agreement
2   (the "Agreement"), ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.
3   Dkt. No. 142 Ex. 14.  The parties continued to negotiate the terms of the Agreement through
4   November 2001 and ultimately signed the Agreement on December 3, 2001.  See Dkt. No. 138 Ex.
5   20. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
6   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Dkt. No. 138 Ex. 16.

### ii. The Terms of the Agreement

Under the Agreement, Tessera granted UTC the right to make, use, and sell "TCC [Tessera Compliant Chip] packages" in exchange for royalties on the basis of those TCCs, calculated by reference to a defined schedule.  Dkt. No. 138 Ex. 2 ¶¶ II.A and III.B.  Particularly, the Agreement's license grant provided UTC with "a worldwide, non-exclusive, non-transferable, non-sublicensable, limited license to the Tessera Patents and Technical Information to assemble ICs into TCC packages and use or sell such TCC Packages."  Dkt. No. 138 Ex. 2 ¶ II.A.  The Agreement defined "TCC" as

> an acronym for Tessera Compliant Chip, a type of integrated circuit ("IC") package which is the subject matter of certain Tessera Patents licensed hereunder.  By way of non-limiting examples, such TCC packages may include IC packages that are in a fan-in arrangement where external electrical terminals overlie a surface of an IC device) or are in a fan-out arrangement (where external electrical terminals are arranged beyond the periphery of an IC device) or are in a fan-in/fan-out arrangement (where external electrical terminals both overlie a surface of an IC device and extend beyond the periphery of the IC device).

Id. ¶ I.A.  Neither party addressed the definition of "TCC" during the course of their negotiations. Dkt. No. 142 Ex. 12 at 121:7-122:2.  The Agreement went on to define "Technical Information" as

> Package assembly know-how relating to the design, manufacture and assembly of TCC packages…which may be proprietary and/or confidential in nature and which may include, without limitation, material specifications, current best method of assembly, tooling specifications, design methods and techniques, proprietary software, process data, yields

  reliability data, and other Tessera engineering data and test results needed by UTC (the foregoing by mutual agreement) to exercise the rights, licenses and privileges granted thereunder.

Dkt. No. 138 Ex. 2 ¶ I.B. It also contained an attachment listing the specific Tessera patents and applications it covers. Dkt. No. 138 Ex. 2 Attach. A. The term of the Agreement was set such that it "shall remain in full force until the expiration of the last to expire of any Tessera Patent." Dkt. No. 138 Ex. 2 ¶ X.A.

### iii. The 2002 Amendment to the Agreement

In August 2002, UTC contacted Tessera regarding a ▮▮▮▮▮▮▮▮ issue it faced as a result of the Agreement. Dkt. No. 138 Ex. 22. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Accordingly, the parties executed the First Amendment to TCC License Agreement and Joint Cooperation Agreement (the "Amended Agreement") on September 24, 2002. Dkt. No. 138 Ex. 24.

The changes to the Agreement highlighted the parties' understanding that the Agreement contemplated a transfer in technology from Tessera to UTC. To that end, the recitals contain statements that "the parties wish to clarify that Tessera transfers technology to Licensee under the Agreement and Licensee will use such technology in Taiwan" and that "the parties wish to amend the Agreement to reflect such intent." Id. The Amended Agreement also contains an explicit recital that "UTC wishes to transfer technology from Tessera and use the Tessera patented technology and Technical Information to assemble said TCC packages and to sell same in accordance with the terms hereof." Id. These amendments appear to be the only relevant changes to the Agreement.

### iv. The Expiration of Tessera's Patents

Following the parties' execution of the Agreement, UTC began to accrue and pay royalties on its wBGA package.[1] UTC asserts that the royalties covered its use of the Tessera '627 and '304

---

[1] The parties acknowledge that UTC did not pay Tessera royalties over a period of time. However, because the parties do not appear to dispute that the royalties continued to accrue during this period, or that the royalties were ultimately

4

Case No.: 5:10-CV-04435-EJD
ORDER GRANTING DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT;
DENYING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

patents, which are part of a patent family known as the Khandros patents. These patents expired on September 24, 2010. Dkt. No. 142 Exs. 17, 18. The day before the Khandros patents expired, UTC notified Tessera that it considered these patents to be the only basis for its royalty payments under the Agreement and thus that it would cease making such payments upon expiration of these patents. Dkt. No. 138 Ex. 42.

### b.  Procedural History

Less than a week after the expiration of the Khandros patents, on September 30, 2010, Tessera filed the instant action against UTC, raising claims of (1) breach of contract; (2) declaratory relief; and (3) breach of the implied covenant of good faith and fair dealing. Dkt. No. 1. UTC filed a motion to dismiss, which this court granted on March 28, 2012. Dkt. No. 76. Tessera filed its First Amended Complaint ("FAC") on April 19, 2012 (Dkt. No. 81) and UTC answered the FAC and filed two counterclaims for declaratory judgment on May 22, 2012 (Dkt. No. 87). On June 26, 2012, this court issued a scheduling order limiting the initial phase of discovery and dispositive motion practice to issues of contract interpretation. Dkt. No. 92. In accordance with that order, the parties filed the instant cross motions for summary adjudication on the issue of contract interpretation on July 3, 2013. The court now turns to the substance of these motions.

## II.   Legal Standard

A motion for summary judgment should be granted if "there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a); Addisu v. Fred Meyer, Inc., 198 F.3d 1130, 1134 (9th Cir. 2000). The moving party bears the initial burden of informing the court of the basis for the motion and identifying the portions of the pleadings, depositions, answers to interrogatories, admissions, or affidavits that demonstrate the absence of a triable issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

If the moving party does not satisfy its initial burden, the nonmoving party has no obligation to produce anything and summary judgment must be denied. Nissan Fire & Marine Ins.

---

paid, the court will not address the digressive dispute regarding UTC's temporary nonpayment. See Dkt. No. 128 at 10.

Co., Ltd. v. Fritz Cos., Inc., 210 F.3d 1099, 1102–03 (9th Cir. 2000).  On the other hand, if the moving party does meet this initial burden, the burden then shifts to the nonmoving party to go beyond the pleadings and designate "specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); Celotex, 477 U.S. at 324.  The court must regard as true the opposing party's evidence, if supported by affidavits or other evidentiary material.  Celotex, 477 U.S. at 324.  However, the mere suggestion that facts are in controversy, as well as conclusory or speculative testimony in affidavits and moving papers, is not sufficient to defeat summary judgment.  See Thornhill Publ'g Co. v. GTE Corp., 594 F.2d 730, 738 (9th Cir. 1979).  Instead, the non-moving party must come forward with admissible evidence to satisfy the burden.  Fed. R. Civ. P. 56(c); see also Hal Roach Studios, Inc. v. Feiner & Co., Inc., 896 F.2d 1542, 1550 (9th Cir. 1990).

Where the moving party will have the burden of proof on an issue at trial, it must affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party.  Soremekun v. Thrifty Payless, Inc., 509 F.3d 978, 984 (9th Cir. 2007).  However, where the nonmoving party will have the burden of proof at trial on a particular issue, the moving party need only point out "that there is an absence of evidence to support the nonmoving party's case." Celotex, 477 U.S. at 325.  Provided there has been adequate time for discovery, summary judgment should be entered against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.  Id. at 322–23.  "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Id. at 323.

**III.   Discussion**

California law governs the interpretation of the Agreement.  "The fundamental goal of contractual interpretation is to give effect to the mutual intention of the parties." Powerine Oil Co., Inc. v. Super. Ct., 37 Cal. 4th 377, 390 (2005); Cal. Civ. Code § 1636.  "It is the outward expression of the agreement, rather than a party's unexpressed intention, which the court will enforce." Winet v. Price, 4 Cal. App. 4th 1159, 1166 (Cal. Ct. App. 1992).  Thus, "[t]o avoid future disputes and to provide predictability and stability to transactions, courts attempt to interpret

6

Case No.: 5:10-CV-04435-EJD
ORDER GRANTING DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT;
DENYING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

the parties' intentions from the writing alone, if possible." Abers v. Rounsavell, 189 Cal. App. 4th 348, 356 (Cal. Ct. App. 2010) (citing Cal. Code Civ. Proc. § 1636). When parties dispute the meaning of language in a contract, the court must determine whether such language is ambiguous by deciding whether it is "reasonably susceptible" to more than one of the interpretations urged by the parties. Badie v. Bank of Am., 67 Cal. App. 4th 779, 798 (1998). "An agreement is not ambiguous merely because the parties (or judges) disagree about its meaning." Abers, 189 Cal. App. 4th at 356. Instead, "words still matter" and "written agreements whose language appears clear in the context of the parties' dispute are not open to claims of 'latent' ambiguity." Id. (citation omitted).

The parties agree that UTC must pay royalties on products that satisfy the definition of TCC ("a type of integrated circuit ('IC') package which is the subject matter of certain Tessera Patents licensed hereunder"). The parties also agree that, pursuant to this definition, UTC must pay royalties on products embodying one or more claims of relevant Tessera patents, as such technology would readily be classified as embodying the "subject matter" of Tessera's patents. The parties disagree, however, as to whether UTC must also pay royalties for products that arguably embody the "subject matter" of Tessera's patents but that are not explicitly covered by the claims of such patents. Accordingly, the parties contend that their cross-motions for summary judgment turn solely on the interpretation of the phrase "subject matter."

Tessera proffers that "subject matter" should be considered in its ordinary and broad sense and found to signify the "core concepts" described in the entire patent document, including in the abstract, specification, drawings, and claims. Dkt. No. 128 at 13, 15. UTC counters that "subject matter," in the context of the Agreement, means the technology that has actually been patented, i.e. only the technology falling under the patents' claims. Dkt. No. 141 at 9. Because the parties have presented a dispute as to the meaning of a term of the Agreement, the court must determine whether that term is reasonably susceptible to either party's interpretation. Badie, 67 Cal. App. 4th at 798. "Whether the contract is reasonably susceptible to a party's interpretation can be

7

Case No.: 5:10-CV-04435-EJD
ORDER GRANTING DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT;
DENYING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

determined from the language of the contract itself or from extrinsic evidence of the parties' intent." Id. (quotation marks and citations omitted).

The court begins with an examination of the language of the Agreement itself. In doing so, the court is mindful that the parties are both sophisticated corporations with experience in patent licensing and thus would have negotiated the Agreement with patent law in mind.[2] See Tex. Instruments Inc. v. Tessera, Inc., 231 F.3d 1325, 1329-30 (Fed. Cir. 2000) (holding that, in interpreting the disputed term "litigation," the district court erred in applying the California Code of Civil Procedure's definition instead of patent law's understanding because the parties were sophisticated technology companies that would have contemplated patent law, including its remedies, when negotiating the contested licensing agreement).

The Agreement obligates Tessera to provide UTC a "license to Tessera Patents and Technical Information to assemble ICs into TCC packages and use or sell such TCC packages." Dkt. No. 138 Ex. 2 ¶ II.A.[3] In return the Agreement obligates UTC to ███████████ ██████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████ Id. ¶¶ III.B, I.F. Of utmost importance to the Agreement, then, is the meaning of TCC, for it forms both the foundation of the license grant and the exclusive basis of the royalty calculation.

Under the Agreement, TCC is defined as "a type of integrated circuit ('IC') package which is the subject matter of certain Tessera Patents licensed hereunder." Dkt. No. 138 Ex. 2 ¶ I.A. The parties spill much ink on the generalized meaning of "subject matter," insisting that the instant motions can be resolved by a reading of this phrase alone. Indeed Tessera embraces the term's breadth, arguing that the court should define the "subject matter" of a patent the same it would the "subject matter" of "a contract, a movie, or anything else." Dkt. No. 128 at 15. Such efforts amount to nothing more than misdirection. The term does not rest alone in the Agreement, such

---

[2] The court would impute this knowledge to the parties regardless of whether it found the Agreement to be a straight patent license, as argued by UTC, or a broader technology license, as argued by Tessera.
[3] As the relevant provisions remain unchanged between the Agreement and the Amended Agreement, and as the parties consistently cite to the Agreement, the court will also cite the Agreement, rather than the Amended Agreement, in its analysis.

8
Case No.: 5:10-CV-04435-EJD
ORDER GRANTING DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT;
DENYING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

that the court must provide guidance on the abstract notion of "subject matter" without any mooring; to the contrary, the term, when read completely as "subject matter of certain Tessera patents" drops its own anchor.

In focusing the parties' arguments on the actual term in dispute—the "subject matter of… patents"—the meaning of the term becomes quite obvious. A "patent," according to the PTO, is:

> a property right granted by the Government of the United States of America to an inventor 'to exclude others from making, using, offering for sale, or selling the invention throughout the United States or importing the invention into the United States' for a limited time in exchange for public disclosure of the invention when the patent is granted.

Glossary, United States Patent and Trademark Office, http://www.uspto.gov/main/glossary/ (last accessed March 28, 2014). Thus, the "subject matter of…patents" as it appears in the Agreement, read in the context of patent law, refers to technology covered by the "property rights" granted to Tessera by the PTO. See 35 U.S.C. § 2(a)(1) (vesting the PTO with the responsibility of granting patents). In patent law, it is axiomatic that the scope of those property rights, i.e. the scope of patent protection, is defined by the claims. 35 U.S.C. § 100(j) (defining "claimed invention" as "the subject matter defined by a claim in a patent or an application for a patent"); Johnson & Johnston Assocs. v. R.E. Serv. Co., 285 F.3d 1046, 1052 (Fed. Cir. 2002) (en banc) ("Both the Supreme Court and this court have adhered to the fundamental principle that claims define the scope of patent protection."). Accordingly, the "subject matter of…patents" refers not to the "core concepts" of the technology as described in the specification, drawings, or elsewhere, but instead to the invention actually disclosed in the claims.[4]

Contrary to Tessera's assertion, the Agreement's definition of "Patent" as including patent applications does not support a finding that "subject matter of…patents" should be understood to

---

[4] Though Tessera provides the court with numerous occurrences of the phrase "subject matter" in patent law where "subject matter" does not refer to property rights, these references only showcase "subject matter" in its generic sense, without relevant qualification; none of the controlling authority Tessera cites relates to the specific term "subject matter of…patents." To the extent that any cited non-binding authority suggests a broader interpretation of that phrase, the court disagrees for the reasons set for above.

9
Case No.: 5:10-CV-04435-EJD
ORDER GRANTING DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT;
DENYING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

cover anything other than patented technology.  Patent applications convey no non-provisional U.S. government-granted "property rights" to the applicant; thus their inclusion in the Agreement's definition of "Patent," and by extension to "Tessera Patents" and "TCC," could indeed suggest a broader understanding of the term than the strict PTO definition.  Yet in this case, the very next section of the disputed Agreement belies any such interpretation. That section, which defines the term "Tessera Patent," ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Dkt. No. 138 Ex. 2 ¶¶ I.D, I.E.  By its terms, the Agreement contemplates that the license grant will extend to include technology disclosed in Tessera's patent applications once those applications have matured, <u>i.e.</u> once the technology has been patented.

Nor do the Agreement and Amended Agreement's references to "Technical Information" compel a different conclusion. Under the Agreement, Tessera provided a license to both "Tessera Patents" and "Technical Information" so that UTC could assemble, use, and/or sell TCC packages. Dkt. No. 138 Ex. 2 ¶ II.A.  "Technical Information" is defined as "package assembly know-how relating to the design, manufacture and assembly of TCC packages."  Dkt. No. 138 Ex. 2 ¶ I.B Thus, under the Agreement, Tessera provided a license both to the patented technology—TCC packages—as well as to the practical information that may be needed to assemble the technology. As has already been discussed, the Agreement defines TCC in clear relationship to "Tessera Patents" (<u>i.e.</u> as the "subject matter of certain Tessera Patents").  The definition of TCC lacks a similarly clear invocation of "Technical Information," likely because the two are distinct concepts. Considering the parties readily defined and used the term "Technical Information" throughout the Agreement, the court will not read that term or its meaning into the definition of TCC. Accordingly, the court finds that the references to "Technical Information" in the Agreement do not serve to expand the meaning of "subject matter of…patents" to include anything other than the patented technology.

Tessera's argument regarding the infringement-based language used elsewhere in the Agreement is equally unpersuasive.  This language appears in the context of UTC's granting

10
Case No.: 5:10-CV-04435-EJD
ORDER GRANTING DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT;
DENYING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

1   Tessera a cross-license to any UTC-made improvements on or relating to the licensed Tessera
2   technology.  The Agreement shows that UTC granted a cross-license to Tessera to use any "UTC
3   improvements and UTC's Patents covering any inventions contained in such UTC Improvements"
4   and defines "UTC improvements" as "derivatives, improvements, modifications, or enhanced
5   specifications relating to a TCC package, or related materials, that may infringe a Tessera Patent or
6   may be made or incorporated in a TCC package by or for UTC."  Dkt. No. 138 Ex. 2 ¶¶ I.G, VII.B.
7   As to the term "covering," Tessera has failed to provide any compelling evidence or argument
8   showing a functional difference between a license to "patents covering [a technology]" and to "the
9   subject matter of…patents;" therefore that the parties employed both phrases in their Agreement
10  does not disturb the court's finding.  As to the phrase "infringe a Tessera Patent," it appears in the
11  distinct context of a hypothetical UTC invention that encroaches upon Tessera's patent rights.  In
12  contrast, the "subject matter of…patents" term at issue in this case appears in the context of
13  defining Tessera's own technology, specifically defining that technology as  "a type of integrated
14  circuit ("IC") package which is the subject matter of certain Tessera Patents."  Dkt. No. 138 Ex. 2 ¶
15  I.A.  It would have been contradictory or even absurd to use the term "infringe" in this latter
16  context, as Tessera certainly could not infringe its own patents.  Under these circumstances, the
17  parties' specific use of infringement-based language in the Agreement does not suggest that
18  "subject matter of…patents" means anything other than the patented technologies.

19      For the reasons stated, the definition of "subject matter of…patents" is not reasonably
20  susceptible to Tessera's interpretation.  Accordingly, the term is not ambiguous and its clear and
21  explicit meaning must govern.  See Bank of the West v. Super. Ct., 2 Cal. 4th 1254, 1264 (1992).
22  Under theses circumstances, the court need not go on to consider the parties' arguments regarding
23  the submitted extrinsic evidence.  The court notes that its conclusion is based only on its above
24  assessment of the narrow term presented.  The court does not by this Order intend to imply a
25  finding on the reasonableness or legality of infringement- versus definition-based licenses,
26  estoppel, or any other matter raised in the parties' briefing not addressed herein.

11

Case No.: 5:10-CV-04435-EJD
ORDER GRANTING DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT;
DENYING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

### IV. Conclusion

Based on the foregoing, the court hereby GRANTS UTC's Motion for Partial Summary Judgment and DENIES Tessera's Motion for Partial Summary Judgment. The court hereby sets a CMC in this matter for May 9, 2014 at 10:00 a.m. The parties shall submit a Joint Case Management Conference Statement, which shall fully comply with the Standing Order for All Judges of the Northern District of California and this court's standing orders, by no later than May 2, 2014.

**IT IS SO ORDERED**

Dated: March 31, 2014



EDWARD J. DAVILA
United States District Judge

Case No.: 5:10-CV-04435-EJD
ORDER GRANTING DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT;
DENYING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT