E-Filed 9/4/2015

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| TESSERA, INC.,<br><br>    Plaintiff,<br><br>    v.<br><br>UTAC (TAIWAN) CORPORATION,<br><br>    Defendant. | Case No.  10-cv-04435-EJD   (HRL)<br><br>**ORDER RE: DISCOVERY DISPUTE JOINT REPORT 14**<br><br>Re: Dkt. No. 336 |

Plaintiff Tessera, Inc. ("Tessera") sues Defendant UTAC (Taiwan) Corporation ("UTC") for alleged failures to pay royalties under a license agreement. The parties initially disputed the criteria for determining which UTC products are royalty-bearing. The court ruled on summary judgment motions related to contract interpretation. Tessera then served UTC with infringement disclosures identifying the products that Tessera contends are royalty-bearing under the agreement. Tessera identified 32 claims of 12 licensed patents. Tessera also contended that two types of UTC packages are covered by the claims of licensed patents and are therefore royalty-bearing. Tessera asserted it did not have enough information to determine whether a third type of UTC package is covered by the patent claims. UTC disputes Tessera's contentions.

UTC argues that several infringement claims depend on whether UTC's packages contain certain empty spaces within themselves. UTC provided Tessera with sample packages and with cross-section photos that show solid matter partially filling those spaces within the packages. Photos in Dr. Bravman's expert report, in contrast to UTC's photos, do not show solid matter partially filling those spaces. Dr. Bravman's report included photos of a package UTC produced and photos of two packages that Tessera bought on the open market.

The court now addresses the parties' Discovery Dispute Joint Report 14 ("DDJR"), which the parties timely filed before expert discovery closed. Dkt. No. 336. UTC requests: (1) any

unproduced photos Tessera took of UTC packages that were either purchased on the open market or produced by UTC; (2) "basic information" about how Tessera took any photos of UTC packages, like lighting; and (3) that Tessera submit the UTC packages in its possession to an independent lab jointly selected by the parties for the creation of new scanning electron microscope cross-section photos. DDJR at 8-9. UTC bases these requests on its First Request for Inspection, its Interrogatory 20, and its Request for Production 69. UTC also invokes the expert-witness disclosure requirements under Federal Rule of Civil Procedure ("FRCP") 26 and the ability to inspect and test tangible things under FRCP 34. DDJR at 2, 11.

Tessera argues: (1) the work-product doctrine and attorney-client privilege independently block the production of the requested photos; (2) the photos are not subject to expert-witness disclosure because expert witness Dr. Bravman "did not review, generate or rely upon" any such images; (3) the production of information about Dr. Bravman's photo-taking methods would be duplicative and burdensome because UTC can ask for that information during a deposition; and (4) Tessera has "no legal obligation" to produce its UTC packages for testing. DDJR at 3-6.

The court resolves UTC's requests in turn.

## Unproduced Photos of UTC Packages

Does attorney-client privilege block the production of unproduced photos that Tessera took of UTC packages? The federal common law governs privilege claims in federal court when the privilege does not relate to a "claim or defense for which state law supplies the rule of decision." Fed. R. Evid. 501. Tessera claims privilege over evidence that relates to federal patent claims, so state law does not supply the rule of decision; the federal common law governs the privilege claim.

The party that asserts attorney-client privilege has the burden to show the privilege applies. *Weil v. Investment/Indicators Research & Management*, 647 F.2d 18, 25 (9th Cir. 1981). The attorney-client privilege prevents "disclosure of communications" but not "disclosure of . . . underlying facts by those who communicated with the attorney[.]" *Upjohn Co. v. United States*, 449 U.S. 383, 395 (1981). Likewise, Tessera's attorney-client privilege prevents disclosure of private communications between Tessera and its lawyers, but does not prevent disclosure of photos included in those communications. *Accord Clavo v. Zarrabian*, No.

2

1  SACV030864CJCRCX, 2003 WL 24272641, at 1 (C.D. Cal. Sept. 24, 2003) (inclusion of photos
2  in privileged communications does not attach attorney-client privilege to the photos).  Tessera has
3  not carried its burden to show attorney-client privilege applies to the photos requested by UTC.

4      Tessera claims the work-product doctrine independently blocks the production of any
5  unproduced photos that Tessera took of UTC packages.  The work-product doctrine codified in
6  FRCP 26(b)(3)(A) generally prevents the production of "documents and tangible things . . .
7  prepared in anticipation of litigation or for trial by . . . another party[.]"  The party that asserts
8  work-product doctrine has the burden to show the doctrine applies.  *See, e.g., Schoenmann v. Fed.*
9  *Deposit Ins. Corp.*, 7 F. Supp. 3d 1009, 1013 (N.D. Cal. 2014).  Tessera alleges that UTC seeks
10 photos taken "by in-house Tessera engineers working under the direction of [Tessera's lawyers] in
11 the course of" this case.  (DDJR at 4.)  Any such photos, prepared by Tessera at the direction of its
12 lawyers for possible use in this case, fit the definition of protected work product.

13     UTC does not expressly discuss how work-product protection might be defeated if it seems
14 to apply.  UTC, instead, states that "Tessera could selectively choose images that [help Tessera's
15 case], while withholding images that do not."  (DDJR at 8.)  UTC sees "no justification" for this
16 selective production.  *Id.*  But UTC describes common behavior that the work-product doctrine
17 generally permits—the selective use of strategic research.  The work-product doctrine promotes
18 the adversary system, protects private strategic thoughts, and prevents lawyers from building cases
19 on the work of their opponents.  *See Castaneda v. Burger King Corp.*, 259 F.R.D. 194, 196 (N.D.
20 Cal. 2009) (citing *United States v. Adlman*, 68 F.3d 1495, 1501 (2d Cir. 1995)); *see also United*
21 *States v. ChevronTexaco*, 241 F. Supp. 2d 1065, 1081 (N.D. Cal. 2002).  Tessera may therefore, in
22 general, withhold unproduced photos of UTC packages as protected work product.

23     Still, Tessera might possess some photos that must be disclosed.  FRCP 26(a)(2)(B)(ii)
24 requires the production of "facts or data considered" by an expert to form his opinions.  An expert
25 "considered" information that he "reviewed" even if the expert did not ultimately rely on that
26 information in his final report.  *See, e.g., S.E.C. v. Reyes*, 2007 WL 963422 at 1 (N.D. Cal. Mar.
27 30, 2007).  As well, FRCP 26(b)(4)(C) provides an exception to work-product protection for "facts
28 or data that the party's attorney provided and that the expert considered" to produce his report.
   Tessera asserts that "Dr. Bravman included all the . . . images that he reviewed or relied upon in

United States District Court
Northern District of California

his report[.]" DDJR at 2. Does this mean that Dr. Bravman was completely insulated from any unproduced photos created by Tessera? Or did Tessera send Dr. Bravman a broader set of photos so that he could help Tessera to select the best work product for use in his report? If Tessera sent Dr. Bravman any unproduced photos of UTC packages and Dr. Bravman ultimately declined to rely on them in his report, then Dr. Bravman nonetheless considered those photos and they must be produced.

### Information About How Photos Were Taken

UTC seeks information about how work-product photos were taken so that UTC can accurately analyze and characterize the produced photos. *See* DDJR at 10. Similarly, UTC seeks information about how the photos in Dr. Bravman's report were taken so that UTC can "test the veracity" of Dr. Bravman's knowledge during his deposition. *See* DDJR at 10. Tessera argues this request is cumulative and unduly burdensome.

Facts about work-product photos must be produced if Dr. Bravman considered those facts while he created his report, even if he did not ultimately rely on those facts. *See* FRCP 26(a)(2)(B)(ii). Work-product protection cannot shield such facts from production. FRCP 26(b)(4)(C). Attorney-client privilege does not attach to those facts simply because they were included in privileged communications. *Upjohn*, 449 U.S. at 395. If Tessera sent Dr. Bravman facts about how photos were taken, and if Dr. Bravman ultimately declined to rely on those facts in his report, then Dr. Bravman nonetheless considered those facts and they must be produced. As well, any other facts Dr. Bravman considered about how photos were taken must be produced; production prior to Dr. Bravman's deposition would not be cumulative or unduly burdensome.

### Independent Analysis of UTC Packages

UTC requests that Tessera submit the UTC packages in its possession to an independent lab that will take new photos. FRCP 34(a)(1) permits a party to "inspect [and] test . . . tangible things[.]" UTC argues that the meaningful opportunity to "check[] and verif[y]" Dr. Bravman's "specialized analysis" is key to UTC's defense. DDJR at 11. Tessera argues that no legal obligation exists to permit UTC to analyze the packages and also cites concerns that, in a third-party lab, the chain of custody might be disrupted and the packages might be damaged. DDJR at

4

6. Dr. Bravman's report includes photos of one package that UTC produced to Tessera as well as photos of two packages Tessera bought on the open market.

The court finds that further tests of packages produced by UTC would be unreasonably cumulative. UTC already took its own cross-sectional photos of these packages before UTC produced them to Tessera. Those photos provide UTC a basis to argue that dissimilar photos taken by Tessera misrepresent UTC's packages; additional photos taken of the same packages for the same purpose would be cumulative.

The court, on the other hand, finds that UTC properly requests an opportunity to create cross-section photos of any UTC packages that were bought on the open market by Tessera and then relied upon by Dr. Bravman. The photos in Dr. Bravman's report are very relevant and UTC cannot fairly defend itself without the opportunity to take similar photos of the packages relied upon by Dr. Bravman. UTC has not yet had that opportunity with respect to the open-market packages. Tessera's bare assertion that "there is no legal obligation to produce the samples" fails to explain why UTC's request to inspect and test Tessera's open-market packages would not be valid under FRCP 34(a)(1). Tessera does not explain why this situation, as opposed to the average request to seek specialized testing under FRCP 34(a)(1), might pose an unusually high risk that the chain of custody will be disrupted or the packages will be damaged.

## Conclusion

Tessera will therefore produce at least fourteen days prior to Dr. Bravman's deposition: (1) any photos of UTC packages that Tessera sent to Dr. Bravman; (2) any facts about how any photos of UTC packages were taken if those facts were sent to Dr. Bravman, even if those facts relate to unproduced work-product photos; and (3) any other unproduced facts-about-how-photos-were-taken that Dr. Bravman considered or relied on. Finally, Tessera will work with UTC to promptly: (1) select a lab; (2) decide on the protocols the lab shall use to take cross-sectional scanning electron microscope photos of the open-market UTC packages relied on by Dr. Bravman; and (3) decide on reasonable steps the parties will take to maintain the chain of custody and the physical integrity of the packages. Tessera will then submit the open-market UTC packages relied on by Dr. Bravman to the lab. Each party shall receive copies of the photos taken by the lab and the packages shall be returned to Tessera. The parties must submit the packages for testing within

the next fourteen days. If the parties fail to reach an agreement and submit the packages for testing within the next fourteen days, then the parties will have seven additional days within which they must file a new DDJR that complies with this court's standing order. That DDJR, if it is needed, shall list the outstanding disagreements about how the open-market packages should be tested; it shall also contain one plan from each party that suggests how the court should resolve the disagreements. The court would then adopt and enforce the suggested plan that seems most reasonable to the court.

**IT IS SO ORDERED.**

Dated: September 4, 2015

_____
HOWARD R. LLOYD
United States Magistrate Judge