UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| TESSERA, INC.,<br><br>       Plaintiff,<br><br>   v.<br><br>UTAC (TAIWAN) CORPORATION,<br><br>       Defendant. | Case No. 5:10-cv-04435-EJD<br><br>**ORDER DENYING MOTION FOR PARTIAL SUMMARY JUDGMENT AS TO CONTRACT INTERPRETATION**<br><br>Re: Dkt. No. 246 |

Presently before the Court in this licensing dispute action is Defendant UTAC (Taiwan) Corporation's ("UTC") Motion for Partial Summary Judgment as to Contract Interpretation against Plaintiff Tessera, Inc. ("Tessera"). Dkt. No. 246. This Court has subject-matter jurisdiction over this action under 28 U.S.C. § 1332(a)(2). Having reviewed the parties' briefing and heard the parties' arguments, the Court DENIES UTC's Motion.

**I.    BACKGROUND**

Tessera is a company with its principal place of business in San Jose, California. See Dkt. No. 300 at 1. Tessera is a patent holding company and developer of semiconductor packaging technology, which is sometimes referred to as "microBGA technology." See Dkt. No. 138 Ex. 1 at 1-2. Semiconductor packages serve as the electrical interface between semiconductor chips and the systems in which they operate. See Dkt. No. 300 at 1. They also protect delicate chips from damage, contamination, and stress resulting from repeated heating and cooling. See id. Tessera

1

has developed semiconductor technologies and owns a portfolio of hundreds of patents on these technologies. See id. Many of the companies in the semiconductor and electronics industries have obtained patent license agreements from Tessera, whose terms grant them limited licenses under specified circumstances to practice certain Tessera patents and other technology, including Tessera's proprietary technical know-how related to semiconductor packaging. See id.

UTC is a branch of the global UTAC Taiwan and provides semiconductor packaging services. See id. In particular, UTC manufactures semiconductor packages by encasing integrated circuits in protective coating, supporting the integrated circuit's electrical contacts so that it can connect to a printed circuit board, and testing the product to make sure that it is functional. See id. at 1-2.

In 2001, UTC began manufacturing a small-format ball grid array package, which it called "window BGA" or "wBGA." See Dkt. No. 138 Ex. 10 at 24:14-20; Ex. 12. By March 2001, a third party named Computer Technology System Corporation ("CTS") had approached UTC regarding a potential patent infringement claim it believed it had against UTC's wBGA package. See Dkt. No. 138 Ex. 9. Shortly thereafter, UTC met with Tessera and raised its concern over a potential patent infringement suit by CTS. On April 27, 2001 Tessera's counsel, Christopher Pickett, sent a letter to UTC's President, C.C. Tsai, addressing UTC's concern and particularly noting that, should UTC take a license under Tessera's MicroBGA Technology and patents, and in particular Tessera's U.S Patents 5,950,304 ("the '304 patent") and 6,133,627 ("the '627 patent"), it could continue to manufacture the packaging using methods that would likely not be held to infringe CTS's patents. Id. In May 2001, Tessera faxed a license term sheet "TCC License Agreement" to UTC. See Dkt. No. 138 Ex. 11.

The parties met in person in Taiwan on June 20, 2001 and August 9, 2001 to discuss terms of the licensing agreement, Tessera's willingness to introduce UTC to potential customers, and the parties' interest in working together on future technology development. See Dkt. No. 138 Exs. 12-13. After these meetings, on August 22, 2001, UTC's legal and intellectual property manager Wei-Heng Shan emailed Mr. Pickett to express UTC's willingness to enter into a licensing

2
Case No.: 5:10-cv-04435-EJD
ORDER DENYING MOTION FOR PARTIAL SUMMARY JUDGMENT AS TO CONTRACT INTERPRETATION

agreement provided the parties could agree on a licensing fee and royalties. See Dkt. No. 138 Ex. 15. In that email, Mr. Shan also noted that UTC executives were "impressed" by Tessera's presentation of its "business cooperation plan" and that they hoped to meet with Tessera's "strategic partners" during an upcoming trip to the United States. Id. Tessera and UTC entered into a License and Joint Cooperation Agreement on December 3, 2001 (the "Agreement"). See Dkt. No. 300 at 2.

### A.  Terms of Agreement

Under the Agreement, Tessera granted UTC the right to make, use, and sell "TCC [Tessera Compliant Chip] packages" in exchange for royalties on the basis of those TCCs, calculated by reference to a defined schedule. See Dkt. No. 246 Ex. 1 ¶¶ II.A and III.B. Particularly, the Agreement's license grant provided UTC with "a worldwide, non-exclusive, non-transferable, non-sublicensable, limited license to the Tessera Patents and Technical Information to assemble ICs into TCC packages and use or sell such TCC Packages." See id. at ¶ II.A.

### B.  The 2002 Amendment to the Agreement

In August 2002, UTC contacted Tessera regarding a Taiwanese tax issue it faced as a result of the Agreement. See Dkt. No. 138 Ex. 22. To remedy the issue, UTC requested a change in wording of two provisions of the Agreement to make clear that the Agreement involved a transfer of technology. Accordingly, the parties executed the First Amendment to TCC License Agreement and Joint Cooperation Agreement (the "Amended Agreement") on September 24, 2002. See Dkt. No. 138 Ex. 24.

The changes to the Agreement highlighted the parties' understanding that the Agreement contemplated a transfer in technology from Tessera to UTC. To that end, the recitals contain statements that "the parties wish to clarify that Tessera transfers technology to Licensee under the Agreement and Licensee will use such technology in Taiwan" and that "the parties wish to amend the Agreement to reflect such intent." Id. The Amended Agreement also contains an explicit recital that "UTC wishes to transfer technology from Tessera and use the Tessera patented technology and Technical Information to assemble said TCC packages and to sell same in

3

Case No.: 5:10-cv-04435-EJD
ORDER DENYING MOTION FOR PARTIAL SUMMARY JUDGMENT AS TO CONTRACT INTERPRETATION

accordance with the terms hereof." Id. These amendments appear to be the only relevant changes to the Agreement.

### C. The Expiration of Tessera's Patents

Following the parties' execution of the Agreement, UTC began to accrue and pay royalties on its wBGA package. UTC asserts that the royalties covered its use of the Tessera '627 and '304 patents, which are part of a patent family known as the Khandros patents. These patents expired on September 24, 2010. See Dkt. No. 142 Exs. 17, 18. The day before the Khandros patents expired, UTC notified Tessera that it considered these patents to be the only basis for its royalty payments under the Agreement and thus that it would cease making such payments upon expiration of these patents. See Dkt. No. 138 Ex. 42.

### D. Procedural History

Less than a week after the expiration of the Khandros patents, on September 30, 2010, Tessera filed the instant action against UTC, raising claims of (1) breach of contract; (2) declaratory relief; and (3) breach of the implied covenant of good faith and fair dealing. Dkt. No. 1. UTC filed a motion to dismiss, which this court granted on March 28, 2012. Dkt. No. 76. Tessera filed its First Amended Complaint ("FAC") on April 19, 2012 (Dkt. No. 81) and UTC answered the FAC and filed two counterclaims for declaratory judgment on May 22, 2012 (Dkt. No. 87). On June 26, 2012, this Court issued a scheduling order limiting the initial phase of discovery and dispositive motion practice to issues of contract interpretation. Dkt. No. 92. On July 3, 2013, the parties filed cross motions for summary adjudication on the issue of contract interpretation. Dkt. No. 128. On March 31, 2014, the Court issued an order granting UTC's motion for partial summary judgment and denying Tessera's motion for partial summary judgment. Dkt. No. 184. There, the Court held that the "subject matter of … patents' refers not to the 'core concepts' of the technology as described in the specification, drawings, or elsewhere, but instead to the invention actually disclosed in the claims." See Dkt. No. 184. Presently before the Court is UTC's Motion for Partial Summary Judgment as to Contract Interpretation. See Dkt. No. 246.

## II. LEGAL STANDARD

A motion for summary judgment or partial summary judgment should be granted if "there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a); Addisu v. Fred Meyer, Inc., 198 F.3d 1130, 1134 (9th Cir. 2000). The moving party bears the initial burden of informing the court of the basis for the motion and identifying the portions of the pleadings, depositions, answers to interrogatories, admissions, or affidavits that demonstrate the absence of a triable issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

If the moving party does not satisfy its initial burden, the nonmoving party has no obligation to produce anything and summary judgment must be denied. Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Cos., Inc., 210 F.3d 1099, 1102–03 (9th Cir. 2000). On the other hand, if the moving party does meet this initial burden, the burden then shifts to the nonmoving party to go beyond the pleadings and designate "specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); Celotex, 477 U.S. at 324. The court must regard as true the opposing party's evidence, if supported by affidavits or other evidentiary material. Celotex, 477 U.S. at 324. However, the mere suggestion that facts are in controversy, as well as conclusory or speculative testimony in affidavits and moving papers, is not sufficient to defeat summary judgment. See Thornhill Publ'g Co. v. GTE Corp., 594 F.2d 730, 738 (9th Cir. 1979). Instead, the non-moving party must come forward with admissible evidence to satisfy the burden. Fed. R. Civ. P. 56(c); see also Hal Roach Studios, Inc. v. Feiner & Co., Inc., 896 F.2d 1542, 1550 (9th Cir. 1990).

Where the moving party will have the burden of proof on an issue at trial, it must affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party. Soremekun v. Thrifty Payless, Inc., 509 F.3d 978, 984 (9th Cir. 2007). However, where the nonmoving party will have the burden of proof at trial on a particular issue, the moving party need only point out "that there is an absence of evidence to support the nonmoving party's case." Celotex, 477 U.S. at 325. Provided there has been adequate time for discovery, summary judgment should be entered against a party who fails to make a showing sufficient to establish the

existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. Id. at 322–23. "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Id. at 323.

### III.   DISCUSSION

California law governs the interpretation of the Agreement. "The fundamental goal of contractual interpretation is to give effect to the mutual intention of the parties." Powerine Oil Co., Inc. v. Super. Ct., 37 Cal. 4th 377, 390 (2005); Cal. Civ. Code § 1636. "It is the outward expression of the agreement, rather than a party's unexpressed intention, which the court will enforce." Winet v. Price, 4 Cal. App. 4th 1159, 1166 (1992). Thus, "[t]o avoid future disputes and to provide predictability and stability to transactions, courts attempt to interpret the parties' intentions from the writing alone, if possible." Abers v. Rounsavell, 189 Cal. App. 4th 348, 356 (2010) (citing Cal. Code Civ. Proc. § 1636). When parties dispute the meaning of language in a contract, the court must determine whether such language is ambiguous by deciding whether it is "reasonably susceptible" to more than one of the interpretations urged by the parties. Badie v. Bank of Am., 67 Cal. App. 4th 779, 798 (1998). "An agreement is not ambiguous merely because the parties (or judges) disagree about its meaning." Abers, 189 Cal. App. 4th at 356. Instead, "words still matter" and "written agreements whose language appears clear in the context of the parties' dispute are not open to claims of 'latent' ambiguity." Id.

UTC argues that the Court's previous ruling precludes Tessera from claiming royalties on all UTC's products based on a patent issued in a country where UTC does not make or sell any products. See Dkt. No. 246 at 2-4. This is a misreading of the previous order. In the previous ruling, the parties disagreed as to "whether UTC must pay royalties for products that arguably embody the 'subject matter' of Tessera's patents but that are not explicitly covered by the claims of such patents." See Dkt. No. 184 at 7. The Court there addressed solely the interpretation of the phrase "subject matter" and held that the "subject matter of … patents refers not to 'core concepts' of the technology as described in the specification, drawings, or elsewhere, but instead to the invention actually disclosed in the claims." See id. The parties now disagree, however, as to

6
Case No.: 5:10-cv-04435-EJD
ORDER DENYING MOTION FOR PARTIAL SUMMARY JUDGMENT AS TO CONTRACT INTERPRETATION

whether the Agreement limits UTC's royalties by geographic scope. See Dkt. No. 246 at 2-4.

Tessera proffers that the Agreement's terms make clear that UTC owes royalties on a worldwide basis. See Dkt. No. 210-4 at 8. For its part, UTC argues that the definition of TCC in the Agreement established the royalty calculation. See Dkt. No. 248 at 3. Because the parties have presented a dispute as to the meaning of a term of the Agreement, the court must determine whether that term is reasonably susceptible to either party's interpretation. Badie, 67 Cal. App. 4th at 798. "Whether the contract is reasonably susceptible to a party's interpretation can be determined from the language of the contract itself or from extrinsic evidence of the parties' intent." Id.

In determining whether the contract is ambiguous, the Court begins with an examination of the language of the Agreement itself. In doing so, the Court is mindful that the parties are both sophisticated corporations with experience in patent licensing and thus would have negotiated the Agreement with patent law in mind. See Tex. Instruments Inc. v. Tessera, Inc., 231 F.3d 1325, 1329-30 (Fed. Cir. 2000) (holding that, in interpreting the disputed term "litigation," the district court erred in applying the California Code of Civil Procedure's definition instead of patent law's understanding because the parties were sophisticated technology companies that would have contemplated patent law, including its remedies, when negotiating the contested licensing agreement).

The royalty clause in the Agreement states that "UTC shall pay running royalties for the license granted in Paragraph II.A. … to Tessera during the term of this Agreement." See Dkt. No. 246 Ex. 1 ¶ III.B. In return, Paragraph II.A of the Agreement obligates Tessera to "grant UTC a world-wide, non-exclusive, non-transferable, non-sublicensable, limited license to the Tessera Patents and Technical Information to assemble ICs ("integrated circuit") into TCC ("Tessera Compliant Chip") packages and use or sell such TCC packages." See id. ¶ II.A. Under the Agreement (Paragraph II.A), there is no limitation on the geographical location of UTC's activities in making or selling the products. However, UTC asserts that the definition of TCC and not the grant clause (Paragraph II.A) or other provisions establishes the "exclusive basis of the

royalty calculation." See Dkt. No. 248 at 3. Again, UTC misreads this Court's previous order, which did not discuss geographic limitations. Moreover, the Agreement defines "TCC" as follows:

> "The term 'TCC' is an acronym for Tessera Compliant Chip, a type of integrated circuit ('IC') package which is the subject matter of certain Tessera patents licensed hereunder. By way of non-limiting examples, such TCC packages may include IC packages that are in a fan-in arrangement (where external electrical terminals overlie a surface of an IC device) or are in a fan-out arrangement (where external electrical terminals are arranged beyond the periphery of an IC device) or are in a fan-in/fan-out arrangement (where external electrical terminals both overlie a surface of an IC device and extend beyond the periphery of the IC device). In such examples, the contact bearing surface of the IC device may face either towards or away from the external electrical terminals."

See Dkt. No. 246 Ex. 1 ¶ I.A. The definition requires that the TCC package be "the subject matter of certain Tessera Patents licensed hereunder" but does not limit UTC's activity by geographical location. See id. Therefore, the Court turns to the meaning of the term "Tessera Patents" in the Agreement for the geographic scope of the royalty calculation.

The Agreement defines "Tessera Patents" as follows:

> "The term 'Tessera Patents' means Patent(s) assigned to Tessera that arise out of inventions based on the Technical Information made and/or acquired by Tessera prior to expiration or termination of this Agreement (excluding Batch Technology as defined herein). The term Tessera Patent shall further include any third party patent based on Technical Information (excluding Batch Technology as defined herein) under which Tessera or any successor thereof has the right to grant licenses of the scope granted herein, as of the Effective Date or at any time during the term of this Agreement, without the payment of royalty or other consideration to such third parties except for payment to third parties for inventions made by said parties while employed by Tessera or any successor thereof. As of the Effective Date of this Agreement, **Tessera Patents, as defined above, consist of those Patents set forth in Attachment A**. Tessera has sole discretion in the prosecution of the Tessera patent applications prospectively licensed hereunder, non-exclusively including … filing corresponding foreign patent applications and/or abandoning one or more of such patent applications."

See Dkt. No. 246 Ex. 1 ¶ I.E.

Here, the term "Tessera Patents" includes all the patents assigned to Tessera that arise out

8
Case No.: 5:10-cv-04435-EJD
ORDER DENYING MOTION FOR PARTIAL SUMMARY JUDGMENT AS TO CONTRACT INTERPRETATION

of the inventions based on the technical information, which "consist of the Patents set forth in Attachment A." See id. The court must consider the words of the agreement, including writings made a part of the contract by annexation or incorporation by reference. 11 Williston on Contracts § 30:5 (4th ed. 2015). Attachment A of the Agreement lists both United States patents and foreign patents (see below).

**FOREIGN PATENTS**

| | PATENT NO. | TITLE |
|---|---|---|
| 1. | 121621 (Korea) | SEMICONDUCTOR CHIP ASSEMBLIES AND METHODS OF MAKING SAME AND COMPONENTS FOR SAME |
| 2. | 209457 (Korea) | SEMICONDUCTOR CONNECTION COMPONENTS AND METHODS WITH RELEASABLE LEAD SUPPORT |
| 3. | 2924923 (Japan) | SEMICONDUCTOR CHIP ASSEMBLIES AND METHODS OF MAKING SAME AND COMPONENTS FOR SAME |
| 4. | 3151219 (Japan) | SEMICONDUCTOR CONNECTION COMPONENTS AND METHODS WITH RELEASABLE LEAD SUPPORT |
| 5. | 2,091,438 (Canada) | SEMICONDUCTOR CHIP ASSEMBLIES AND METHODS OF MAKING SAME AND COMPONENTS FOR SAME |

See Dkt. No. 246 Ex. 1 at Attachment A. Therefore, the "Tessera Patents" referenced in the definition of TCC expressly include world-wide patents from Korea, Japan, Canada, Europe, and applications under the PCT international treaty as well as in the United States. See id.

UTC also contends that the tribunal in Tessera-Amkor arbitration rejected Tessera's similar argument of assessing royalties on a world-wide basis. See Dkt. No. 248 at 4. As such, UTC now argues that the Court should reject the same arguments Tessera offers here. See id. Similar to Amkor, UTC's assembly services for products made under the asserted patents also occur overseas. See Dkt. No. 246 Ex. 6 ¶ 615. Because of the similarities with Amkor, UTC argues that "to determine royalties, [the tribunal did] not look to the grant clause; [rather they looked] to the royalty clause." See Dkt. No. 248 at 3. However, in the next sentence, the Amkor tribunal points out that "the royalty clause limits royalties to packages 'made under' the licensed patents," which include patents from "South Korea, Japan, Canada, Europe … as well as in the United States." See Dkt. No. 246 Ex. 6 ¶ 614-15. Most importantly, the Amkor tribunal states that "Tessera could have asserted its foreign patents in this proceeding. However, Tessera chose

9
Case No.: 5:10-cv-04435-EJD
ORDER DENYING MOTION FOR PARTIAL SUMMARY JUDGMENT AS TO CONTRACT INTERPRETATION

1  to assert only the U.S. patents.  Tessera stated during Closing Arguments that the foreign patents
2  were excluded because they would complicate the case." See id.  Unlike in Amkor, Tessera here
3  chose to assert both U.S. and foreign patents in this proceeding.  Therefore, UTC's argument is
4  unpersuasive.

5        For the reasons stated, the definition of "Tessera Patents" is not reasonably susceptible to
6  UTC's interpretation.  Accordingly, the term is not ambiguous and its clear and explicit meaning
7  must govern.  See Bank of the West v. Super. Ct., 2 Cal. 4th 1254, 1264 (1992).  Under these
8  circumstances, the Court need not go on to consider the parties' arguments regarding the
9  submitted extrinsic evidence.

## IV. CONCLUSION

Based on the foregoing, the Court thereby DENIES UTC's Motion for Partial Summary Judgement as to Contract Interpretation.  The Court understands that this decision may severely complicate this case.  Accordingly, the Court schedules this action for a case management conference to discuss this topic for 10:00 a.m. on December 3, 2015.  The parties shall file a joint case management statement on or before November 25, 2015.

**IT IS SO ORDERED.**

Dated: September 30, 2015

EDWARD J. DAVILA
United States District Judge

Case No.: 5:10-cv-04435-EJD
ORDER DENYING MOTION FOR PARTIAL SUMMARY JUDGMENT AS TO CONTRACT INTERPRETATION