UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| TESSERA, INC., <br>     Plaintiff, <br> v. <br> UTAC (TAIWAN) CORPORATION, <br>     Defendant. | Case No. 5:10-cv-04435-EJD <br><br> **ORDER GRANTING DEFENDANT'S MOTION FOR CLARIFICATION** <br><br> Re: Dkt. No. 372 |

In this ongoing dispute over the terms of a patent licensing agreement, Defendant UTAC (Taiwan) Corporation ("UTC") moves this court to clarify one of its prior summary judgment orders addressing contract interpretation. In opposition, Plaintiff Tessera, Inc. ("Tessera") argues UTC is not entitled to relief.

Having reviewed all of the relevant documents, the court has determined that a clarification is appropriate here. Thus, UTC's motion will be granted and a detailed clarification will be provided according to the discussion below.

I. **BACKGROUND**

Given the two summary judgment orders filed in this case, the court will not provide a full recitation of the parties' 2001 License and Joint Cooperation Agreement (hereinafter the "Agreement"). Suffice it say the Agreement provided to UTC a "world-wide" limited license to "Tessera Patents and Technical Information to assemble" semiconductor integrated circuits, or "ICs," in order to assemble Tessera Compliant Chip packages, or "TCC" packages, and to use or sell such packages. In return for the license, UTC agreed to pay royalties to Tessera. In 2010, a disagreement arose between Tessera and UTC concerning UTC's ongoing obligation to pay

1
Case No.: 5:10-cv-04435-EJD
ORDER GRANTING DEFENDANT'S MOTION FOR CLARIFICATION

1  royalties subsequent to the expiration of certain of Tessera's patents. The disagreement eventually
2  materialized into this case, in which Tessera asserts three claims against UTC based on the
3  Agreement: (1) breach of contract, (2) declaratory relief, and (3) breach of the implied covenant of
4  good faith and fair dealing.

In 2013, the parties filed cross-motions for summary judgment on the issue of contract interpretation. There, the parties agreed that UTC must pay royalties on products that satisfy the definition of TCC, which the Agreement defines as "a type of [IC] package which is the subject matter of certain Tessera Patents." The parties also agreed that UTC must pay royalties on products embodying one or more claims of the Tessera Patents, as such technology would be classified as embodying the "subject matter" of the Tessera's Patents. The parties disagreed, however, as to whether the term "subject matter" encompassed products arguably embodied by Tessera's patents but not explicitly covered by the claims of those patents. The court found that such products were not contemplated by the Agreement and construed the disputed language as follows:

> The "subject matter of . . . patents" as it appears in the Agreement, read in the context of patent law, refers to technology covered by the "property rights" granted to Tessera by the PTO . . . . In patent law, it is axiomatic that the scope of those property rights, i.e. the scope of patent protection, is defined by the claims . . . . Accordingly, the "subject matter of . . . patents" refers not to the "core concepts" of the technology as described in the specification, drawings, or elsewhere, but instead to the invention actually disclosed in the claims.

Consequently, UTC's motion was granted and Tessera's motion was denied.

But that did not end the contract interpretation issues in this case. Since the Agreement tied the royalty obligation to the claims of Tessera's patents, the claim language of those patents needed to be construed in order to determine which packages fell within their scope. To accomplish that task, the court engaged in a process normally reserved for patent infringement cases - claim construction - and utilized it as a method of contract interpretation. An order addressing those issues was filed on November 30, 2015.

In addition, the court permitted UTC to file an additional summary judgment motion on a

2
Case No.: 5:10-cv-04435-EJD
ORDER GRANTING DEFENDANT'S MOTION FOR CLARIFICATION

separate but related contact interpretation issue. That motion concerned the geographic scope of UTC's royalty obligations. UTC stated the motion was necessary because Tessera was claiming it could collect royalties based on a patent for products that were not made or sold in the country that issued the patent. UTC argued the Agreement did not allow for the collection of such royalties due to certain limiting principles underlying patent law, as applied through California contract law. To that end, UTC argued that a patent owner cannot use a domestic patent to collect royalties for products made or sold in a foreign country because patents only confer rights in the country that issued the patents.

Unsurprisingly, Tessera disagreed with this interpretation of the Agreement. In its opposition, Tessera argued the plain language of the Agreement contemplated a worldwide license, and that UTC paid royalties on a worldwide basis while the Agreement was in effect. Tessera also argued, contrary to UTC's legal argument, that "[t]here is nothing exotic or illegal about a contract that provides for payment on worldwide sales, even when a patent does not exist in a particular country."

In the order directed at this dispute filed on September 30, 2015, the court took note of the parties' disagreement over the geographic scope of the Agreement and first looked to the contract itself to determine whether it contained any such limiting language. The court answered that question in the negative, but went on to construe the Agreement's use of "Tessera Patents" since it appeared from the parties' arguments that the use of that term within the definition of TCC was central to the determination of geographical scope. The court held the term "Tessera Patents" references both foreign and domestic patents, including those patents from the United States, Korea, Japan, Canada, and Europe. Based on that determination, the court then concluded that the definition of the "Tessera Patents" is not reasonably susceptible to UTC's more limited interpretation.

UTC now moves for clarification of the September 30th Order.

## II. DISCUSSION

In seeking clarification, UTC acknowledges that the term "Tessera Patents" includes

3
Case No.: 5:10-cv-04435-EJD
ORDER GRANTING DEFENDANT'S MOTION FOR CLARIFICATION

patents issued by other countries and that such foreign patents could form the basis of a royalty calculation. But what UTC claims is that this determination does not actually address the issue it presented in its second summary judgment motion addressing contract interpretation. UTC argues the issue presented was the following: whether a product could qualify as the "subject matter" of a particular patent issued by a particular country if the product never has any contact with the country that issued the patent? It therefore seeks clarification of the court's statement that the definition of "Tessera Patents" is not reasonably susceptible to UTC's interpretation and confirmation that it did address or resolve whether or not Tessera's interpretation would constitute patent misuse.

This motion has two layers, which are discussed below.

**A.    Layer 1: Whether Clarification of the September 30th order is Necessary**

This motion's first layer involves whether or not the September 30th order requires clarification in the manner identified by UTC. "A court may clarify its order for any reason." Wahl v. Am. Sec. Ins. Co., No. C 08-0555 RS, 2010 U.S. Dist. LEXIS 84878, at *9, 2010 WL 2867130 (N.D. Cal. July 20, 2010). This type of request "invite[s] interpretation, which trial courts are often asked to supply, for the guidance of the parties." Bordallo v. Reyes, 763 F.2d 1098, 1102 (9th Cir. 1985). "From this, it is apparent that the clarification process presumes some legitimate need supporting relief, such as the existence of ambiguity or confusion that can [be] corrected with further explanation." Mohammed v. City of Morgan Hill, No. 5:10-cv-05630 EJD, 2011 U.S. Dist. LEXIS 123496, at *4, 2011 WL 5085497 (N.D. Cal. Oct. 25, 2011). "But where an order or direction of the court is clear, it follows that clarification is unnecessary." Id.

Here, as UTC points out, the court's analysis of geographical scope in the September 30th Order concentrated on an issue - the construction of the term "Tessera Patents - which was not directly presented through the parties' summary judgment briefing. By placing the focus on that term, the court ultimately resolved whether or not the foreign patents listed in an attachment to the Agreement could form the basis of a royalty calculation. The court found that those patents are royalty-bearing and concluded that "Tessera Patents" was not susceptible to UTC's interpretation

4
Case No.: 5:10-cv-04435-EJD
ORDER GRANTING DEFENDANT'S MOTION FOR CLARIFICATION

to the extent it believed otherwise.

But as UTC stated in this motion, it has no quarrel with that idea that royalties can be based on the foreign patents included as part of the Agreement. Instead, what UTC argued in its summary judgment motion was whether the implicit restrictions placed on a patent's extraterritorial effect by virtue of the law which governs them are also incorporated into the provisions of the Agreement, such that royalties are not accrued under a particular patent when products are not made or sold within the jurisdiction that issued the patent. The court undeniably did not answer that question and, as such, the September 30th Order is one that would benefit from clarification because it is at least ambiguous and, at most, confusing.

The court therefore clarifies that its conclusion rejecting a purported interpretation by UTC did not encompass the issue of whether, based on a patent issued in a particular country, Tessera can collect royalties not only on products made or sold in that country, but also on products that never come into contact with that country. Nor did The September 30th Order address arguments based on patent misuse.

**B.   Layer 2: Ruling on the Issue Presented in UTC's Second Summary Judgment Motion on Contract Interpretation**

With that, the court proceeds to this motion's second layer and will now address the issue presented in the briefing that led up to the September 30th Order. The court finds this necessary given the parties' enduring disagreement over the meaning of the Agreement's terms. And to be sure, the court has the power to render a decision now, even if UTC did not explicitly ask for the ruling in the clarification motion. See Fed. R. Civ. P. 54(b) ("[A]ny order or other decision, however designated, that adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties does not end the action as to any of the claims or parties and may be revised at any time before the entry of a judgment adjudicating all the claims and all the parties' rights and liabilities."); see also City of Los Angeles v. Santa Monica Baykeeper, 254 F.3d 882, 885-88 (9th Cir. 2001) (holding that the district court may sua sponte revise interlocutory orders).

5

Case No.: 5:10-cv-04435-EJD
ORDER GRANTING DEFENDANT'S MOTION FOR CLARIFICATION

### A. Legal Standard

A motion for summary judgment or partial summary judgment should be granted if "there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a); Addisu v. Fred Meyer, Inc., 198 F.3d 1130, 1134 (9th Cir. 2000). The moving party bears the initial burden of informing the court of the basis for the motion and identifying the portions of the pleadings, depositions, answers to interrogatories, admissions, or affidavits that demonstrate the absence of a triable issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

If the moving party does not satisfy its initial burden, the nonmoving party has no obligation to produce anything and summary judgment must be denied. Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Cos., Inc., 210 F.3d 1099, 1102-03 (9th Cir. 2000). On the other hand, if the moving party does meet this initial burden, the burden then shifts to the nonmoving party to go beyond the pleadings and designate "specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); Celotex, 477 U.S. at 324. The court must regard as true the opposing party's evidence, if supported by affidavits or other evidentiary material. Celotex, 477 U.S. at 324. However, the mere suggestion that facts are in controversy, as well as conclusory or speculative testimony in affidavits and moving papers, is not sufficient to defeat summary judgment. See Thornhill Publ'g Co. v. GTE Corp., 594 F.2d 730, 738 (9th Cir. 1979). Instead, the non-moving party must come forward with admissible evidence to satisfy the burden. Fed. R. Civ. P. 56(c); see also Hal Roach Studios, Inc. v. Feiner & Co., Inc., 896 F.2d 1542, 1550 (9th Cir. 1990). Where the moving party will have the burden of proof on an issue at trial, it must affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party. Soremekun v. Thrifty Payless, Inc., 509 F.3d 978, 984 (9th Cir. 2007). However, where the nonmoving party will have the burden of proof at trial on a particular issue, the moving party need only point out "that there is an absence of evidence to support the nonmoving party's case." Celotex, 477 U.S. at 325. Provided there has been adequate time for discovery, summary judgment should be entered against a party who fails to make a showing sufficient to establish the existence of an element

essential to that party's case, and on which that party will bear the burden of proof at trial. Id. at 322-23. "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Id. at 323.

**B.     Discussion**

As before, the critical phrase in the Agreement is the definition of TCC as a "type of [IC] package which is the subject matter of certain Tessera Patents." Notably, neither this phrase nor any other provision of the Agreement explicitly provides a geographical restriction in the calculation and payment of royalties. Therefore, the question presented is whether TCC should be interpreted so as to incorporate certain restrictions expressed by basic tenets of patent law. This precise issue was not necessarily decided by the first summary judgment decision.[1]

The goal of contract interpretation is to give effect to the parties' mutual intent. Cal. Civ. Code § 1636; Bank of the West v. Super. Ct., 2 Cal. 4th 1254, 1264 (1992). "Such intent is to be inferred, if possible, solely from the written provisions of the contract." In re Marriage of Lafkas, 237 Cal. App. 4th 921, 932 (2015) (citing Cal. Civ. Code § 1639). "The 'clear and explicit' meaning of these provisions, interpreted in their 'ordinary and popular sense,' unless 'used by the parties in a technical sense or a special meaning is given to them by usage' . . . controls judicial interpretation." Id. (citing Cal. Civ. Code §§ 1638, 1644). "A contract may be explained by reference to the circumstances under which it was made, and the matter to which it relates." Cal. Civ. Code § 1647. But "[h]owever broad may be the terms of a contract, it extends only to those things concerning which it appears that the parties intended to contract." Cal. Civ. Code § 1648. In addition, "interpretations that create absurd or unreasonable results" must be avoided. Sequeira v. Lincoln Nat'l Life Ins. Co., 239 Cal. App. 4th 1438, 1445 (2015).

This court has previously observed that, given the Agreement is one for the licensing of

---

[1] UTC initially argued that the order on the first summary judgment motion decided the issue by of geographic scope because it clarified that UTC's royalty obligation is tied to the claims of Tessera's patents. But there was no such geographic expression in the court's decision. Nor is such a ruling inconsistent with an interpretation finding that the parties intended to calculate royalties on some basis that does not account for a patent's extraterritorial limitations.

7
Case No.: 5:10-cv-04435-EJD
ORDER GRANTING DEFENDANT'S MOTION FOR CLARIFICATION

patented technology, and because Tessera and UTC are sophisticated corporations well-aware of the law that governs patents, "these contracting parties would have negotiated the clauses of the patent license agreement with knowledge of patent law." Texas Instruments, Inc. v. Tessera, Inc., 231 F.3d 1325, 1329 (2000). Thus, during the discussion that resulted in the Agreement, Tessera and UTC would have known the Patent Act provides a patentee with the "right to exclude others from making, using, offering for sale, or selling the [patented] invention." 35 U.S.C. § 154(a)(1). They would have also known that Tessera's monopoly right does have an extraterritorial effect, (Microsoft Corp. v. AT&T Corp., 550 U.S. 437, 454 ("The presumption that United States law governs domestically but does not rule the world applies with particular force in patent law" and is "embedded in the Patent Act itself, which provides that a patent confers exclusive rights in an invention within the United States.")), and that "there are established limits which the patentee must not exceed in employing the leverage of his patent to control or limit the operations of the licensee" such that Tessera generally cannot "extend the monopoly of [its] patent to derive a benefit not attributable to use of the patent's teachings." Zenith Radio Corp. v. Hazeltine Research, Inc., 395 U.S. 100, 139 (1969). In other words, the parties must have been aware that a patentee like Tessera "may not use the power of [its] patent to levy a charge for making, using, or selling products not within the reach of the monopoly granted by the Government" unless, as the Supreme Court has held, the parties reached a mutually-convenient business arrangement for the payment of royalties. Id. at 136-37 (citing Brulotte v. Thys Co., 379 U.S. 29, 33 (1964)).

The fact that the parties must have negotiated the Agreement with patent law in mind does not win the day for UTC, however, because it simply raises a pair of possible scenarios. In the first, the parties to the Agreement did exactly as UTC proposes and intended the contract terms to incorporate the limits of patent law. In the second, the parties were aware of the law but purposely negotiated around or outside of it. Here, because Tessera has produced extrinsic evidence concerning the parties' course of dealing which potentially supports the second scenario, the court must consider it under the parol evidence rule.

Parol evidence, including that describing the parties' course of dealing, "is properly

8
Case No.: 5:10-cv-04435-EJD
ORDER GRANTING DEFENDANT'S MOTION FOR CLARIFICATION

admitted to construe a written instrument when its language is ambiguous." Winet v. Price, 4 Cal. App. 4th 1159, 1165 (1992); Cal. Civ. Proc. Code § 1856(c). "The test of whether parol evidence is admissible to construe an ambiguity is not whether the language appears to the court to be unambiguous, but whether the evidence presented is relevant to prove a meaning to which the language is 'reasonably susceptible.'" Id. Indeed, "[t]he fact that the terms of an instrument appear clear to a judge does not preclude the possibility that the parties chose the language of the instrument to express different terms." Pac. Gas & Elec. Co. v. G. W. Thomas Drayage & Rigging Co., Inc., 69 Cal. 2d 33, 39 (1968). "[R]ational interpretation requires at least a preliminary consideration of all credible evidence offered to prove the intention of the parties." Id. at 39-40.

In California, the decision to admit parol evidence involves a two-step process. Winet, 4 Cal. App. 4th at 1165. At the first step, "the court provisionally receives (without actually admitting) all credible evidence concerning the parties' intentions to determine 'ambiguity,' i.e., whether the language is 'reasonably susceptible" to the interpretation urged by a party." Id. At the second step, "[i]f in light of the extrinsic evidence the court decides the language is 'reasonably susceptible' to the interpretation urged, the extrinsic evidence is then admitted to aid in the second step - interpreting the contract." Id. Relevant here, the terms of an agreement "may be explained or supplemented by course of dealing or usage of trade or by course of performance." Cal. Civ. Proc. Code § 1856(c).

Resolution of an ambiguity, as with the concept of contract interpretation in general, is a question of law unless the interpretation turns upon the credibility of extrinsic evidence. Badie v. Bank of Am., 67 Cal. App. 4th 779, 799 (1998).

Tessera has produced several items of extrinsic evidence in support of its more expansive interpretation, all of which the court has provisionally received under the first step of the parol evidence analysis. Two of these items are particularly compelling. The first item includes evidence of the parties' actual course of dealing, which shows that UTC paid royalties under two of Tessera's U.S. patents without regard to the location of the royalty-bearing products. In fact,

9
Case No.: 5:10-cv-04435-EJD
ORDER GRANTING DEFENDANT'S MOTION FOR CLARIFICATION

UTC admitted during discovery that it paid royalties in that way.[2]  The second item is a declaration from purported licensing expert Harry J. Gwinnell, in which he states that, based on his experience in the industry, the language used in Agreement evidences the parties' assent to a worldwide license.  He further states that payment of royalties on such a license is frequently calculated on the licensee's global use in order to simplify the administration of the license.  Because these items of evidence demonstrate that the Agreement is reasonably susceptible to Tessera's interpretation, it is admissible under the parol evidence rule.

Turning to the second step of the analysis, the actual interpretation of the Agreement cannot be undertaken solely by the court in light of the admissible extrinsic evidence.  This is because, as Tessera argues, arriving at the proper construction of the disputed language will turn on the credibility of the extra-contractual evidence; an issue that only a jury can resolve.  See City of Hope Nat'l Med. Ctr. v. Genentech, Inc., 43 Cal. 4th 375, 395 (holding that when "ascertaining the intent of the parties at the time the contract was executed depends on the credibility of extrinsic evidence, that credibility determination and the interpretation of the contract are questions of fact that may properly be resolved by the jury").  Moreover, the court cannot - on *these* arguments and on *this* evidence at least - find Tessera's interpretation unreasonable or unfair under the teachings of Zenith Radio Corporation and related authority, and thereby adopt UTC's interpretation, because the properly-admitted extrinsic evidence suggests the parties may have intended to measure royalty payments on the basis of sales rather than on the geographic effectiveness of any particular patent.  Consequently, on a motion for summary judgment like this one, the court cannot discern whether UTC has credibly explained why it previously paid royalties in a manner seemingly inconsistent with its own interpretation of the Agreement, and similarly cannot decide whether to accept Gwinnell's expert testimony as credible.  Anderson v. Liberty

---

[2] In response to one of Tessera interrogatories concerning the payment of royalties, UTC responded: "UTC wished to obtain license protection from Tessera's U.S. patents numbers 6,133,627 and 5,950,034 for all of the wBGA packages that it assembled.  Accordingly, during the life of those patents, UTC was willing to pay royalties for all of its wBGA packages, regardless of where they were made, used, sold or shipped."

1   Lobby, Inc., 477 U.S. 242, 255 (1986) ("Credibility determinations, the weighing of the evidence,
2   and the drawing of legitimate inferences from the facts are jury functions, not those of a judge,
3   whether he is ruling on a motion for summary judgment or for a directed verdict."). Since those
4   factual determinations are critical the issue of interpretation, UTC's motion for summary judgment
5   must remain denied.[3]

### III.  ORDER

UTC's motion for clarification (Docket Item No. 372) is GRANTED.

**IT IS SO ORDERED.**

Dated: January 15, 2016



EDWARD J. DAVILA
United States District Judge

---

[3] This decision, of course, does not rule out the possibility that the Agreement may constitute patent misuse if ultimately interpreted in the manner advocated by Tessera.

11
Case No.: 5:10-cv-04435-EJD
ORDER GRANTING DEFENDANT'S MOTION FOR CLARIFICATION