IRELL & MANELLA LLP
Morgan Chu (70446) (mchu@irell.com)
Joseph M. Lipner (155735) (jlipner@irell.com)
Benjamin W. Hattenbach (186455) (bhattenbach@irell.com)
Richard W. Krebs (278701) (rkrebs@irell.com)
Dominik Slusarczyk (287084) (dslusarczyk@irell.com)
Jackson S. Trugman (295145) (jtrugman@gmail.com)
1800 Avenue of the Stars, Suite 900
Los Angeles, California 90067-4276
Telephone:    (310) 277-1010
Facsimile:    (310) 203-7199

*Attorneys for Plaintiff Tessera, Inc.*

## UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

## SAN JOSE DIVISION

| | |
|---|---|
| TESSERA, INC.,<br><br>                          Plaintiff,<br><br>      v.<br><br>UTAC (TAIWAN) CORP.,<br><br>                          Defendant. | Case No. 5:10-cv-04435-EJD<br><br>**TESSERA, INC.'S OPPOSITION AND CROSS MOTION FOR SUMMARY JUDGMENT**<br><br>Date: February 18, 2016<br>Time: 9:00 a.m.<br>Courtroom: 4 – 5th Floor |

# TABLE OF CONTENTS

**Page(s)**

INTRODUCTION ................................................................................................................. 1

I.    THE COURT SHOULD GRANT TESSERA SUMMARY JUDGMENT THAT PATENT INVALIDITY IS NOT A DEFENSE TO TESSERA'S CLAIMS FOR UNPAID ROYALTIES BEFORE SEPTEMBER 29, 2014. ................................................................ 2

    A.    A Licensee Owes Royalties Until The Date It Challenges The Patents' Validity. ............................................................................. 2

    B.    UTC's Validity Arguments Do Not Affect The Royalties It Owes From Before September 29, 2014, When UTC First Challenged The Patents' Validity. ........................................................ 3

    C.    Applying *Shell Oil* Will Greatly Simplify This Case. ................... 6

    D.    Invalidity Is Not A Defense To The Payment Of Royalties On Foreign Patents. ........................................................................ 6

II.    THE COURT SHOULD GRANT TESSERA SUMMARY JUDGMENT ON UTC'S PATENT MISUSE DEFENSES ................................... 7

    A.    "Patent Misuse" Requires Proof Of Coercion, And UTC Has No Evidence of Coercion. ................................................................ 7

    B.    Courts Approve Of Licenses Providing For Royalties To Be Paid On A Worldwide Portfolio Basis. ....................................... 10

    C.    At Minimum, UTC's Cross-Motion For Summary Judgment Of Patent Misuse Must Be Denied. ......................................... 10

III.    UTC IGNORES THE SUBSTANTIAL EVIDENCE SUPPORTING DR. BRAVMAN'S OPINION THAT SOLDER BALL PADS ARE "TERMINALS." ..................................................................... 14

IV.    UTC'S ARGUMENTS ABOUT THE '587 PATENT ARE LEGALLY IMPERMISSIBLE AND FACTUALLY CONTESTED. ................. 17

V.    UTC'S FLURRY OF ARGUMENTS ABOUT THE '611 PATENT IGNORE THE COURT'S MARKMAN ORDER, ELEMENTARY PRINCIPLES OF LAW, AND EXPERT OPINIONS OF RECORD. ................. 20

VI.    UTAC FAILS TO ESTABLISH NONINFRINGEMENT OF THE '272, '952, '328, AND '480 PATENTS. .............................................. 23

    A.    "Compliant Pads" Are Present In The Royalty-Bearing Products ........................................................................................ 23

    B.    "Encapsulant Surrounding" Is Present In the Royalty-Bearing Products ........................................................................................ 25

    C.    "Channels" Are Present In The Royalty-Bearing Products ........ 26

**IRELL & MANELLA LLP**
A Registered Limited Liability
Law Partnership Including
Professional Corporations

6672664

**Page(s)**

D.    "Alignment" Is Present In The Royalty-Bearing Products ..........................27

VII.    UTAC FAILS TO ESTABLISH NONINFRINGEMENT OF THE '952 PATENT ..............................................................................................28

VIII.    UTC FAILS TO ESTABLISH INVALIDITY OF THE '952, '272, '480, OR '328 PATENTS ..................................................................29

    A.    UTC Has Not Established That '952 Claim 34 Is Invalid..........................30

    B.    UTC Has Not Established That '272 Claims 1, 3, 6, And 19 Are invalid. ...................................................................................................33

        1.    Claim 1 is valid...............................................................33

        2.    Claim 3 is valid...............................................................34

        3.    Claim 6 is valid...............................................................34

        4.    Claim 19 is valid.............................................................34

    C.    UTC Has Not Established That '480 Claims 1, 9, And 11 Are Invalid. .................................................................................................35

        1.    Claim 1 is valid...............................................................35

        2.    Claims 9 and 11 are valid................................................36

    D.    UTC Has Not Established That '328 Claims 1 And 6 Are Invalid. .................................................................................................37

IX.    UTC OWES ROYALTIES FOR TCC PACKAGES MADE, SOLD, AND TRANSFERRED BY UTC IN CONNECTION WITH UTC MODULES..................................................................................................37

    A.    UTC Owes Royalties On TCC Packages It Made And Installed Onto Modules....................................................................................37

    B.    UTC Owes Royalties On Packages It Asserts Were Initially Assembled By Others .................................................................................38

X.    UTC BREACHED THE AGREEMENT BY REFUSING TO PAY ROYALTIES FOUND OWING IN KPMG'S FINAL AUDIT REPORT................................................................................................39

CONCLUSION ............................................................................................................40

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

6672664

- ii -

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*A.C. Aukerman Co. v. R.L. Chaides Const. Co.*,
29 U.S.P.Q.2d 1054 (N.D. Cal. 1993) ................................................................ 7

*Abraham v. Super Buy Tires, Inc.*,
No. 05CV1296-B(NLS), 2007 WL 1450311 (S.D. Cal. May 15, 2007) ............................. 20

*ActiveVideo Networks, Inc. v. Verizon Commc'ns, Inc.*,
694 F.3d 1312 (Fed. Cir. 2012) ...................................................................... 32

*Adkins v. Lear, Inc.*,
67 Cal. 2d 882 (1967), *vacated*, 395 U.S. 653 (1969) ............................................ 2

*Adv. Card Techs., LLC v. Versatile Card Tech., Inc.*,
410 F. Supp. 2d 158 (S.D.N.Y. 2006) ............................................................... 3

*Altiris, Inc. v. Symantec Corp.*,
318 F. 3d 1363 (Fed. Cir. 2003) ................................................................... 21

*Am. Piledriving Equip., Inc. v. Geoquip, Inc.*,
637 F.3d 1324 (Fed. Cir. 2011) .................................................................... 17

*Am. Sterilizer Co. v. Sybron Corp.*,
614 F.2d 890 (3d Cir. 1980) ......................................................................... 3

*Applera Corp. v. MJ Research Inc.*,
349 F. Supp. 2d 321 (D. Conn. 2004) ................................................................ 8

*Automatic Radio Mfg. Co. v. Hazeltine Research, Inc.*,
339 U.S. 827 (1950) .............................................................................. 8, 12

*Bayer AG v. Housey Pharms.*,
228 F. Supp. 2d 467 (D. Del. 2002) ................................................................. 8

*Brilliant Instruments, Inc. v. GuideTech, LLC*,
707 F.3d 1342 (Fed. Cir. 2013) .................................................................... 14

*Bristol Locknut Co. v. SPS Techs., Inc.*,
677 F.2d 1277 (9th Cir. 1982) ....................................................................... 4

*Brulotte v. Thys Co.*,
379 U.S. 29 (1964) ............................................................................... 7, 10

*Cantrell v. Wallick*,
117 U.S. 689 (1886) ................................................................................ 18

*Charles Mach. Works, Inc. v. Vermeer Mfg. Co.*,
723 F.3d 1376 (Fed. Cir. 2013) .................................................................... 14

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

**Page(s)**

*Cleveland Tech. Ctr., Inc. v. Portec, Inc.*,
C.A. No. 81C-MR-111, 1983 Del. Super. LEXIS 636 (Del. Super. Ct. June 6, 1983) ..................................................................................................................... 4

*Engel Indus, Inc. v. Lockformer Co.*,
96 F.3d 1398 (Fed. Cir. 1996) .................................................................................... 12

*Esoterix Genetic Labs LLC v. Qiagen Inc.*,
No. 14-CV-13228-ADB, 2015 WL 5680331 (D. Mass. Sept. 25, 2015) ................................ 3

*Exergen Corp. v. Wal-Mart Stores, Inc.*,
575 F.3d 1312 (Fed. Cir. 2009) .................................................................................. 20

*Genentech, Inc. v. Chiron Corp.*,
112 F.3d 495 (Fed. Cir. 1997) .................................................................................... 28

*Geotag, Inc. v. Frontier Communs. Corp.*,
No. 2:10-CV-00265-JRG, 2014 WL 341802 (E.D. Tex. Jan. 30, 2014) ................................ 14

*Hull v. Brunswick Corp.*,
704 F.2d 1195 (10th Cir. 1983) .................................................................................... 3

*Icon Health & Fitness, Inc. v. Park City Ent'mt, Inc.*,
2013 WL 4027504 (D. Utah Aug. 7, 2013) ..................................................................... 3

*Immersion Corp. v. HTC Corp.*,
No. CV 12-259-RGA, 2015 WL 627425 (D. Del. Feb. 11, 2015) ...................................... 34

*Invitrogen Corp. v. Biocrest Mfg., L.P.*,
327 F.3d 1364 (Fed. Cir. 2003) ............................................................................ 28, 30

*Joyal Products, Inc. v. Johnson Elec. N. Am., Inc.*,
No. CIV.A.04-5172 (JAP), 2008 WL 4630500 (D.N.J. Oct. 17, 2008) ................................ 31

*KCJ Corp. v. Kinetic Concepts, Inc.*,
223 F.3d 1351 (Fed. Cir. 2000) .................................................................................. 29

*Kimble v. Marvel Entertainment, LLC*,
135 S.Ct. 2401 (2015) ............................................................................................. 10

*Lear, Inc. v. Adkins*,
395 U.S. 653 (1969) ........................................................................................ 2, 3, 6, 7

*Levenger Co. v. Feldman*,
516 F. Supp. 2d 1272 (S.D. Fla. 2007) ........................................................................... 3

*Martin v. Ford Alexander Corp.*,
160 F. Supp. 670 (S.D. Cal. 1958) .............................................................................. 18

*Martinez v. Marin Sanitary Serv.*,
349 F. Supp. 2d 1234 (N.D. Cal. 2004) ........................................................................ 38

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

6672664

- iv -

**Page(s)**

*Milliken Research Corp. v. Dan River, Inc.*,
739 F.2d 587 (Fed. Cir. 1984)................................................................................................. 18

*Net MoneyIN, Inc. v. VeriSign, Inc.*,
545 F.3d 1359 (Fed. Cir. 2008) .............................................................................................. 30

*Pandrol USA, LP v. Airboss Ry. Prods., Inc.*,
320 F.3d 1354 (Fed. Cir. 2003) .............................................................................................. 19

*Pony Pal, LLC v. Claire's Boutiques, Inc.*,
2006 WL 846354 (S.D.N.Y. Mar. 31, 2006) ........................................................................... 3

*Powertech Tech. Inc. v. Tessera, Inc.*,
2014 U.S. Dist. LEXIS 5441 (N.D. Cal. Jan. 15, 2014).......................................... 7, 8, 10, 14

*PPG Indus., Inc. v. Westwood Chem., Inc.*,
530 F.2d 700 (6th Cir. 1976).................................................................................................... 3

*Princo Corp. v. ITC*,
616 F.3d 1318 (Fed. Cir. 2010) ................................................................................................ 7

*Raylon, LLC v. Complus Data Innovations, Inc.*,
700 F.3d 1361 (Fed. Cir. 2012)............................................................................................... 28

*Regents of Univ. of Minn. v. Medical, Inc.*,
382 N.W.2d 201 (Minn. Ct. App. 1986) ................................................................................... 8

*Revson v. Claire's Stores, Inc.*,
120 F. Supp. 2d 322 (S.D.N.Y. 2000) ....................................................................................... 3

*Rite-Nail Packaging Corp. v. Berryfast, Inc.*,
706 F.2d 933 (9th Cir. 1983)..................................................................................................... 3

*Studiengesellschaft Kohle, M.B.H. v. Shell Oil Co.*,
112 F.3d 1561 (Fed. Cir. 1997).......................................................................................... passim

*Sunrise Med. Hhg v. Airsep Corp.*,
95 F. Supp. 2d 348 (W.D. Pa. 2000) ......................................................................................... 8

*Super Future Equities, Inc. v. Wells Fargo Bank Minn., N.A.*,
2007 WL 4410370 (N.D. Tex. Dec. 14, 2007) ........................................................................ 38

*Tate Access Floors, Inc. v. Interface Architectural Res., Inc.*,
279 F.3d 1357 (Fed. Cir. 2002) .............................................................................................. 19

*Tessera, Inc. v. United Test and Assembly Center, Ltd.*,
Alameda County Superior Court No. RG08410327 ............................................................. 8, 9

*Tex. Instruments, Inc. v. Hyundai Elecs. Indus.*,
49 F. Supp. 2d 893 (E.D. Tex. 1999)................................................................................. 10, 12

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

6672664

**Page(s)**

*Transclean Corp. v. Bridgewood Servs., Inc.*,
290 F.3d 1364 (Fed. Cir. 2002) ....................................................................................... 23

*Trintec Indus., Inc. v. Top–U.S.A. Corp.*,
295 F.3d 1292 (Fed. Cir. 2002) ....................................................................................... 36

*TriQuint Semiconductor, Inc. v. Avago Techs. Ltd.*,
No. CV-09-1531-PHX-JAT, 2012 WL 1432529 (D. Ariz. Apr. 25, 2012) ........................ 27

*U.S. Philips Corp. v. Int'l Trade Comm'n*,
424 F.3d 1179 (Fed. Cir. 2005) ....................................................................................... 10

*W.L. Gore & Associates, Inc. v. Garlock, Inc.*,
721 F.2d 1540 (Fed. Cir. 1983) ....................................................................................... 18

*Well Surveys, Inc. v. Perfo-Log, Inc.*,
396 F.2d 15 (10th Cir. 1968) .............................................................................................. 7

*Wonderland Nurserygoods Co., Ltd. v. Kids II, Inc.*,
No. 13-cv-1114-TWT, 2014 WL 2094295 (N.D. Ga. May 20, 2014) ................................ 29

*Yoon Ja Kim v. ConAgra Foods, Inc.*,
465 F.3d 1312 (Fed. Cir. 2006) ....................................................................................... 30

*York Prods., Inc. v. Cent. Tractor Farm & Family Ctr.*,
99 F.3d 1568 (Fed. Cir. 1996) ......................................................................................... 28

*Zenith Elecs. Corp. v. PDI Commc'n Sys., Inc.*,
522 F.3d 1348 (Fed. Cir. 2008) ....................................................................................... 19

*Zenith Radio Corp. v. Hazletine Research, Inc.*,
395 U.S. 100 (1969) .................................................................................................... 8, 12

*Zila, Inc. v. Tinnell*,
502 F.3d 1014 (9th Cir. 2007) ..................................................................................... 7, 12

**Statutes**

35 U.S.C. § 102 ............................................................................................................................ 30

35 U.S.C. § 103 ............................................................................................................................ 30

35 U.S.C. § 282 .............................................................................................................................. 5

**Treatises**

1 Dratler § 4.04,
*Licensing of Intellectual Property* ..................................................................................... 8

2 Jay Dratler, Jr.,
*Licensing of Intellectual Property* § 7.07 ........................................................................... 8

**IRELL & MANELLA LLP**
A Registered Limited Liability
Law Partnership Including
Professional Corporations

6672664

**Page(s)**

Hal. D. Cooper,
  *Estoppel to Challenge Patent Validity: The Case of Private Good Faith vs.*
  *Public Policy*,
  18 W. Res. L. Rev. 1122 (1967)..................................................................................... 2

Harold Einhorn & Eric Bensen,
  *Patent Licensing Transactions* § 3.04 (2012) ....................................................... 12

Jay Dratler, Jr.,
  *Licensing of Intellectual Property* § 4.03.............................................................. 12

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

6672664

| **GLOSSARY OF TERMS** | |
| --- | --- |
| **Abbreviation** | **Document** |
| Agmt. or Agreement | Tessera, Inc. and United Test Center, Inc. TCC® License and Joint Cooperation Agreement, as amended (Exhibit U to DHH) |
| BD1 | Exhibit C to JB (Deposition of John C. Bravman, Ph.D. – Day 1) |
| BD2 | Exhibit D to JB (Deposition of John C. Bravman, Ph.D. – Day 2) |
| BR1 | Exhibit A to JB (Expert Report of John C. Bravman, Ph.D.) |
| BR2 | Exhibit B to JB (Rebuttal Expert Report of John C. Bravman, Ph.D.) |
| CT | Declaration of Christian Tregillis In Support of Tessera's Cross Motion for Summary Judgment and Opposition to UTC's Motion for Summary Judgment, dated January 19, 2016 |
| DHH | Declaration of David H. Herrington in support of UTAC (Taiwan) Corporation's Motion for Summary Judgment, D.I. 391-3 |
| DM | Declaration of DeForest McDuff In Support of Tessera's Cross Motion for Summary Judgment and Opposition to UTC's Motion for Summary Judgment, dated January 14, 2016 |
| GD | Exhibit B to HG (Deposition of Harry J. Gwinnell) |
| GR | Exhibit A to HG (Expert Report of Harry J. Gwinnell) |
| HG | Declaration of Harry J. Gwinnell In Support of Tessera's Cross Motion for Summary Judgment and Opposition to UTC's Motion for Summary Judgment, dated January 19, 2016 |
| Infringe or infringement | Shorthand for embodying the subject matter of the licensed Tessera patents |
| JB | Declaration of John C. Bravman In Support of Tessera's Cross Motion for Summary Judgment and Opposition to UTC's Motion for Summary Judgment, dated January 18, 2016. |
| MR | Exhibit A to DM (Expert Report of Dr. DeForest McDuff) |
| RK | Declaration of Richard W. Krebs In Support of Tessera's Cross Motion for Summary Judgment and Opposition to UTC's Motion for Summary Judgment, dated January 21, 2016 |
| RU | Declaration of Richard Ulrich in support of UTC's Motion for Summary Judgment, dated August 7, 2015 |
| RU1 | Exhibit A to RU (Expert Report of Richard Ulrich Regarding Invalidity) |

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

| GLOSSARY OF TERMS | |
|---|---|
| **Abbreviation** | **Document** |
| RU2 | Exhibit B to RU (Expert Report of Richard Ulrich Regarding Non-Infringement) |
| RU3 | Ex. C to RU (Deposition of Richard Ulrich – Day 1) |
| RU4 | Ex. D to RU (Deposition of Richard Ulrich – Day 2) |
| TR | Exhibit A to CT (Expert Report of Christian Tregillis) |
| UB | UTAC (Taiwan) Corporation's Motion for Summary Judgment, D.I. 391 |
| '265 | Ex. H to DHH |
| '272 | Ex. M to DHH |
| '328 | Ex. N to DHH |
| '374 | Ex. R to DHH |
| '382 | Ex. Q to DHH |
| '480 | Ex. O to DHH |
| '587 | Ex. F to DHH |
| '611 | Ex. K to DHH |
| '627 | Ex. L to DHH |
| '861 | Ex. I to DHH |
| '923 | Ex. S to DHH |
| '952 | Ex. P to DHH |
| '977 | Ex. J to DHH[1] |

---

[1] All emphasis added unless noted otherwise.  All exhibits are attached to the Krebs Declaration submitted with this motion unless noted otherwise.

**IRELL & MANELLA LLP**
A Registered Limited Liability
Law Partnership Including
Professional Corporations

6672664

**INTRODUCTION**

Tessera seeks summary judgment on two issues.  First, under the Federal Circuit's *Shell Oil* doctrine, the patent defense of invalidity is not a defense to contract claims for non-payment of royalties, where the royalty obligations accrued before a licensee first challenged validity.  UTC first challenged the validity of the patents at issue on September 29, 2014, when it served its invalidity contentions.  Tessera therefore seeks summary judgment that invalidity is not a defense to UTC's non-payment of royalties before that date.  *Shell Oil* significantly simplifies both this motion and the trial.  Seven of the nine patents at issue, including *all* of the asserted foreign patents, expired before UTC's validity challenge.  This means validity is irrelevant and does not need to be decided for any of these seven patents, or for any foreign patent.  For the same reason, *Shell Oil* renders moot almost all the invalidity arguments in UTC's summary judgment motion.

Second, Tessera seeks summary judgment on UTC's defense of "patent misuse," which cannot be proven because it never happened.  UTC suggests it was unlawful for the parties to enter into a worldwide patent license that does not mirror the territorial restrictions of patent law.  But to prove patent misuse, UTC must do more than to show the contract obligations and the reach of patent law are different; the defense requires that UTC prove that Tessera improperly "coerced" UTC into agreeing to these contract terms.  There is no evidence of coercion, because it did not occur.  This was an "arms' length" transaction, and worldwide portfolio licenses such as this one are regularly approved by courts.

In contrast to Tessera's motion on two narrow issues, UTC's motion indiscriminately seeks summary judgment on literally dozens of factually disputed technical issues.  There are two primary problems with UTC's arguments.  First, they are based on misstatements and misapplication of patent law.  For example, UTC consistently argues that if it infringes, it practices the prior art and thus the patent is invalid.  The Federal Circuit has explained in no uncertain terms that such an analysis is legally improper.  UTC also commits such errors as claiming that multiple patents cannot cover the same products (they can) and arguing based on claim constructions that the Court already rejected.  Second, every one of UTC's summary judgment arguments depends on questions that are mired in detailed factual disputes.  UTC simply ignores the substantial evidence supporting Tessera, which is not permissible on summary judgment.  UTC's motion should be denied in its entirety.

I.   **THE COURT SHOULD GRANT TESSERA SUMMARY JUDGMENT THAT PATENT INVALIDITY IS NOT A DEFENSE TO TESSERA'S CLAIMS FOR UNPAID ROYALTIES BEFORE SEPTEMBER 29, 2014.**

A.   **A Licensee Owes Royalties Until The Date It Challenges The Patents' Validity.**

This is a contract case, not a patent case.  Under the Agreement, ███████████████████

████████████████████████████████████████████████████████████

██████ DHH Ex. U ¶ III.B.  If the contract were simply enforced as written, all of UTC's invalidity arguments would fail.  For many years, courts held that unless a contract expressly provided for royalties based on patent validity – ████████████████████ – licensees could not defend a contract action by challenging patent validity.  *See Adkins v. Lear, Inc.*, 67 Cal. 2d 882, 891 (1967), *vacated*, 395 U.S. 653 (1969); Hal. D. Cooper, *Estoppel to Challenge Patent Validity: The Case of Private Good Faith vs. Public Policy*, 18 W. Res. L. Rev. 1122, 1123 (1967).  In 1969, the U.S. Supreme Court carved out a narrow exception to this rule in *Lear, Inc. v. Adkins*.  395 U.S. 653 (1969).  The Court balanced the competing concerns of contract law and patent policy and concluded that a licensee may challenge a patent that it believes in good faith to be invalid, and if the patent is invalid, may avoid royalty payments that accrued during the time the licensee was "challenging patent validity in the courts."  *Id.* at 673.  *Lear* left open the question of whether a licensee must pay royalties that accrued before the licensee challenged validity.

In *Studiengesellschaft Kohle, M.B.H. v. Shell Oil Co.*, 112 F.3d 1561, 1568 (Fed. Cir. 1997) ("*Shell Oil*"), the Federal Circuit squarely addressed this issue and articulated the modern rule: A patent licensee can avoid contractual royalty obligations based on the invalidity of a licensed patent *only* if the licensee (1) "provides notice to the licensor that the reason for ceasing payment of royalties is because [the licensee] has deemed the relevant [patent] claims to be invalid," and (2) "actually ceases payment of royalties."

In *Shell Oil*, the licensee agreed to pay the licensor royalties for using a process covered by the licensor's patent.  *Id.* at 1563.  The licensee later began using a different process that it determined was not covered by the patent, and thus not royalty-bearing.  *Id.*  When the licensor discovered these activities, it terminated the license and brought suit for unpaid royalties through termination and for patent infringement after that date.  *Id.*  The licensee defended the case by claiming that the patent was

invalid. *Id.* at 1563-64. Although the district court found the patent invalid and disposed of the patent infringement claim on that basis, it held that the licensor could nevertheless recover the unpaid royalties. *Id.* at 1563. The Federal Circuit largely agreed. The Court observed that the licensee benefited from the license even though the patent was invalid; for example, the agreement kept the licensee "insulated from unlicensed competition" and "insulated from investigations of infringement." *Id.* at 1568. Considering these benefits, the Court found it would have been unjust to condition the licensee's royalty obligations on the validity of the patent before it challenged the patent's validity. *Id.*

Thus, *Shell Oil* held that a licensee could obtain the protection of the *Lear* rule only once it stops payment and provides notice that it is doing so because the licensee "has deemed the relevant claims to be invalid." *Id.* Anything short of that would have permitted the licensee to benefit from the license by keeping under wraps its challenge to the licensed patent. *Id.* The Ninth Circuit adopted the same rule as *Shell Oil*. *See Rite-Nail Packaging Corp. v. Berryfast, Inc.*, 706 F.2d 933, 936-37 (9th Cir. 1983) ("[M]ere nonpayment of royalties is not enough . . . The licensee must clearly notify the licensor that the licensee is challenging the patent's validity."). Other circuit and district courts also regularly apply the *Shell Oil* rule.[2] And the International Chamber of Commerce applied *Shell Oil* in an arbitration between Tessera and its former licensee Amkor Technology, Inc. Ex. 1 at 9-10.

Under this rule, even after a licensee both stops paying *and* challenges validity, the licensee remains contractually liable for royalties accruing before the challenge. In *Shell Oil*, for example, the Federal Circuit ordered the district court to calculate royalties up until the day the licensee challenged validity, even though the patent was ultimately found to be invalid. *Shell Oil*, 112 F.3d at 1568.

### B.    UTC's Validity Arguments Do Not Affect The Royalties It Owes From Before September 29, 2014, When UTC First Challenged The Patents' Validity.

Applying the *Shell Oil* rule, UTC cannot avoid its obligation to pay royalties before September

---

[2] *See, e.g.*, *Hull v. Brunswick Corp.*, 704 F.2d 1195, 1204 (10th Cir. 1983); *Am. Sterilizer Co. v. Sybron Corp.*, 614 F.2d 890, 897-98 (3d Cir. 1980); *PPG Indus., Inc. v. Westwood Chem., Inc.*, 530 F.2d 700, 706 (6th Cir. 1976); *Esoterix Genetic Labs LLC v. Qiagen Inc.*, No. 14-CV-13228-ADB, 2015 WL 5680331 at *11 (D. Mass. Sept. 25, 2015); *Icon Health & Fitness, Inc. v. Park City Entm't, Inc.*, No. 1:10-cv-193-RJS, 2013 WL 4027504 at *3-10 (D. Utah Aug. 7, 2013); *Levenger Co. v. Feldman*, 516 F. Supp. 2d 1272, 1289 (S.D. Fla. 2007); *Pony Pal, LLC v. Claire's Boutiques, Inc.*, No. 05 Civ. 2355(CSH), 2006 WL 846354 at *2-3 (S.D.N.Y. Mar. 31, 2006) *Advanced Card Techs., LLC v. Versatile Card Tech., Inc.*, 410 F. Supp. 2d 158, 160-62 (S.D.N.Y. 2006); *Revson v. Claire's Stores, Inc.*, 120 F. Supp. 2d 322, 327 (S.D.N.Y. 2000).

29, 2014—the date it challenged Tessera's patents—on the basis of patent invalidity. Under the terms of the parties' Agreement, UTC must pay specified royalties ███████████████████████ ████████████████████████████████████████████ Agmt. ¶ III.B. A ███████████ is ████████ ████████████████████████████████████████████████████ *Id.* ¶ I.A. ████████████████████████████ ████████████████████████████ The Agreement here is similar to the contract in *Shell Oil*, which required that the products use the process described in the licensed patent but did not make royalties dependent on patent validity. *Shell Oil*, 112 F.3d at 1567. To assert validity as a defense to its royalty obligation, UTC must rely on the federal rule articulated in *Shell Oil*, which applies only from the date that UTC specifically challenged the validity of the patents. *Id.* at 1568.

To qualify as a validity challenge under *Shell Oil*, the challenge must be clear and unequivocal, sufficient to spur an immediate adjudication of the validity of the patent. *See, e.g.*, *Bristol Locknut Co. v. SPS Techs., Inc.*, 677 F.2d 1277, 1283 (9th Cir. 1982) ("A licensee remains obligated to pay all royalties under a licensing agreement which accrue until it takes ***an affirmative step that would prompt the early adjudication of the validity of the patent***, such as filing an action contesting the patent's validity or notifying the licensor that the payments were being stopped because the patent was believed to be invalid."); *Cleveland Tech. Ctr., Inc. v. Portec, Inc.*, C.A. No. 81C-MR-111, 1983 Del. Super. LEXIS 636 at *6 (Del. Super. Ct. June 6, 1983) ("A sufficient challenge does not occur until ***the licensee assumes an unequivocal position on the validity of the patent*** sufficient to encourage an early adjudication of the matter."). Anything less and the licensee could "exploit the protection of the contract and patent rights and then later . . . abandon conveniently its obligations under those same rights." *Shell Oil.*, 112 F.3d at 1568 (Fed. Cir. 1997).

UTC first challenged Tessera's patent claims in its September 29, 2014 contentions, asserting they were invalid and stating the reasons for the purported invalidity. Ex. 2. But before then, UTC never challenged any of the licensed patents' validity—and certainly not in the clear and unequivocal manner the law requires. For example, ████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

6672664

██████████████████████████████████████████████████████

██████████████████████████████████████ Ex. 3 at 1. ████████

█████████████████████████████████████████████████████████████

████████████ *Id.* In follow-up correspondence, Tessera requested clarification of the reasons for UTC's non-payment. Again, UTC did not rely on validity. Instead, UTC again asserted a purported lack of patent coverage. *See.* Ex. 4 at 1 ████████████████████████████████ ████████████████████████████ ; *id.* ████████████████████████████ ████████████████████████████████████████████ ; Ex. 5 at 1 ██████████ █████████████████████████████████████████████████████████████ Indeed, UTC's president wrote that the reason for the non-payment was ███████████ ████████████████████████ *Id.* None of these letters mentioned invalidity. Even UTC's Answer in this case did not assert invalidity of the licensed patents as a defense. D.I. 88. UTC chose to forego this defense even though federal law required UTC to plead the defense if UTC intended to put patent validity at issue. *See* 35 U.S.C. § 282 (providing that "[i]nvalidity of the patent or any claim in suit" is a "defense[] in any action involving the validity or infringement of a patent ***and shall be pleaded***"). Instead, UTC continued to assert throughout the answer that it had no royalty obligation because there was no patent coverage. *See, e.g.* D.I. 88 ¶ 64 ("[UTC] has no obligation to pay royalties on a product that has ***not been shown to embody*** the patented subject matter of any licensed Tessera Patent."); *id.* ¶ 10 (same); *id.* ¶ 23 (asserting Tessera never required royalties "without a showing ***that the product is covered*** by the claims of a licensed Tessera patent."). Nor did UTC mention any alleged patent invalidity in its prayer for relief. Instead, UTC simply asked the Court to "declare that there is no obligation under the Patent License Agreement to pay royalties for products that Tessera has not shown to be covered by any licensed Tessera Patent." *Id.* at 16.

UTC also never mentioned validity as a reason for stopping royalty payments in its discovery responses before September 24, 2014. Tessera's Interrogatory No. 2 asked UTC to "[s]et forth each and every factual basis for UTAC's contention that it is no longer obligated to pay royalties for any UTAC product pursuant to The Agreement." Ex. 6 at 10. UTC did not mention validity. *Id.* (underline in original). To this day, UTC has not supplemented this response.

**C.      Applying *Shell Oil* Will Greatly Simplify This Case.**

*Shell Oil* will substantially streamline this case.  Per the Court's order, Tessera identified nine licensed patents and sixteen patent claims that cover the accused products. Ex. 7.  UTC challenges the validity of all the claims.  But *seven* of these patents, which include *twelve* of the asserted claims, expired before September 29, 2014, the date UTC challenged the patents.[3]  Thus, for these patents, UTC's invalidity challenge came too late: UTC owed royalties on those seven patents until they expired, and UTC's post-expiration validity challenge cannot change that.  For those seven patents, all of UTC's royalty obligations accrued before UTC challenged validity, such that invalidity is not a defense to non-payment.  These patents include all three of Tessera's foreign patents, meaning there is no need to adjudicate the validity of *any* of Tessera's foreign patents.

In addition to streamlining the issues for trial, application of *Shell Oil* will moot almost all the validity arguments in UTC's cross-motion for summary judgment.  Thus, the Court would not need to consider UTC's arguments in the following sections of UTC's brief:  Sections VII.B (validity of the '611), VIII.C (validity of the '952), IX (validity of the '952), XI.B (validity of the  '272) and XI.D (validity of the '328).  Under *Shell Oil*, UTC could only assert validity challenges to *two* patents and *four* patent claims that expired after UTC's challenge:  the '587 (claim 1), which expired on August 18, 2015; and the '480 (claims 1, 9 and 11) which expired on July 25, 2015.  And even as to these patents, invalidity would not be a defense to UTC's royalty obligations before September 29, 2014.

**D.      Invalidity Is Not A Defense To The Payment Of Royalties On Foreign Patents.**

Foreign patents are not subject to a validity challenge for a further, independent reason: the *Lear* and *Shell Oil* exception to the enforcement of contracts does not apply to foreign patents. *Lear* and its progeny, including *Shell Oil*, are based on U.S. patent law and policy.  *See, e.g.*, *Lear*, 395 U.S. at 673 (considering how "overriding federal policies" modify state contract law); *Shell Oil*, 112 F.3d at 1568 (considering "federal patent policy").  They do not create an exception for contractual obligations arising under non-U.S. patents issued by foreign sovereigns.  *See, e.g.*,

---

[3] (1) The three foreign patents, EP Patent '382 (claim 1), EP Patent '374 (claims 1 and 5) and JP Patent '923 (claim 1) expired on 9/24/2011; (2) the '611 (claim 1) expired 9/20/2013; and (3) the '272 (claims 1, 3, 6 and 19), '952 (claim 34) and '328  (claims 1 and 6) expired 9/20/2014.

*Zila, Inc. v. Tinnell*, 502 F.3d 1014, 1024 (9th Cir. 2007) (refusing to apply the *Brulotte* abrogation of state contract law, which, like the *Lear* abrogation, is based on U.S. patent policy, to royalty obligations arising under non-U.S. patents) (citing *Brulotte v. Thys Co.*, 379 U.S. 29 (1964)); *see also* Ex. 1 at 12 ("[T]he Tribunal finds that it would be an unjustifiable extension of *Lear* for an arbitral tribunal applying California law to hold that US federal policy applies to foreign patents. Thus, given existing precedents, the Tribunal finds that the issue is controlled by the law of California and Amkor is estopped to contest validity of the foreign licensed patents.").  Therefore, Tessera is entitled to summary judgment that UTC may not avoid royalties on non-U.S. patents by putting their validity at issue.

## II.   THE COURT SHOULD GRANT TESSERA SUMMARY JUDGMENT ON UTC'S PATENT MISUSE DEFENSES

The Court should grant summary judgment in favor of Tessera on UTC's defenses of patent misuse. UTC's defense fails because it cannot prove the necessary element of coercion, and because it is attempting to attack a royalty arrangement that courts widely accept.  Even were it not for these fundamental failures, at minimum UTC is not entitled to summary judgment of patent misuse because of numerous material disputed facts on other elements of the defense.

### A.   "Patent Misuse" Requires Proof Of Coercion, And UTC Has No Evidence of Coercion.

Patent misuse is a judge-made doctrine that limits a patent holder's right to impose certain conditions on a patent license. *Princo Corp. v. ITC*, 616 F.3d 1318, 1321 (Fed. Cir. 2010).  The doctrine is a narrow one: "Because patent misuse is a judge-made doctrine that is in derogation of statutory patent rights against infringement, [courts have] not applied the doctrine of patent misuse expansively." *Id.* at 1321.  "[I]n order to constitute a misuse, there must be an element of coercion, such as where there has been a request by a prospective licensee for a license under less than all of the patents and a refusal by the licensor to grant such a license." *Well Surveys, Inc. v. Perfo-Log, Inc.*, 396 F.2d 15, 17 (10th Cir. 1968); *accord, e.g.*, *Powertech Tech. Inc. v. Tessera, Inc.*, 2014 U.S. Dist. LEXIS 5441, at *28 (N.D. Cal. Jan. 15, 2014) (granting summary judgment on patent misuse claim because of lack of "evidence indicating that [Powertech] entered into the TCC License because of some coercive behavior on Tessera's part"); *A.C. Aukerman Co. v. R.L. Chaides Const. Co.*, 29

U.S.P.Q.2d  1054, 1059 (N.D. Cal. 1993) ("Chaides failed to demonstrate that the package agreements containing the expired licenses were the result of Aukerman's coercion. This bars application of the misuse defense."); *Sunrise Med. Hhg v. Airsep Corp.*, 95 F. Supp. 2d 348, 457 (W.D. Pa. 2000) ("A package license . . . is not unlawful per se or a misuse of the patent, absent coercion."); 2 Jay Dratler, Jr., *Licensing of Intellectual Property* § 7.07 ("[P]ackage licensing raises antitrust or misuse questions only when it is coerced.").

A patentee "coerces" the grant of a patent license upon a particular arrangement only "where the patentee refuses to license on any other basis and leaves the licensee with the choice between a license so providing and no license at all." *Applera Corp. v. MJ Research Inc.*, 349 F. Supp. 2d 321, 328-29 (D. Conn. 2004) (quoting *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 135 (1969)).  Coercion requires not only generalized insistence on such a term as a condition of the license, but a clear record of an alternative proposal by the licensee and an inflexible rejection by the patentee.  Thus, "the prospective licensee must propose alternatives to invoke the defense of patent misuse."  1 Dratler § 4.04[2][b].  A finding of coercion requires a patentee's "*rejections* of licensee proposals to pay for actual use." *Bayer AG v. Housey Pharms., Inc.*, 228 F. Supp. 2d 467, 470-71 (D. Del. 2002) (emphasis in original).  Many courts have rejected claims of patent misuse due to lack of coercion.[4]

Two courts have granted summary judgment of no patent misuse specifically in the context of Tessera patent licenses because—as in the present case—there was no evidence of coercion or conditioning.  In *Powertech*, 2014 U.S. Dist. LEXIS 5441, Judge Wilken granted summary judgment in favor of Tessera on the plaintiff-licensee's claim that Tessera's licensing terms constituted patent misuse because the plaintiff-licensee "has offered no evidence that it was coerced into entering the license agreements or that Tessera had refused to enter into an agreement with it unless it agreed to pay royalties on products that did not practice the patented technology." *Id.* at *27-28.  Similarly, in *Tessera, Inc. v. United Test and Assembly Center, Ltd.*, Alameda County Superior Court No. RG08410327, UTC's parent company, UTAC, Ltd. ("UTAC"), had a dispute with Tessera about the

---

[4] *See, e.g.*, *Automatic Radio Mfg. Co. v. Hazeltine Research, Inc.*, 339 U.S. 827, 833-834 (1950); *Bayer AG*, 228 F. Supp. 2d at 470-471; *Applera Corp.*, 349 F. Supp. 2d at 330-38; *Engel Indus. v. Lockformer Co.*, 96 F.3d 1398, 1408-09 (Fed. Cir. 1996); *Regents of Univ. of Minn. v. Med., Inc.*, 382 N.W.2d 201, 210-11 (Minn. Ct. App. 1986).

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional  Corporations

6672664

- 8 -

terms of its separate license agreement and asserted affirmative defenses based on patent misuse. Judge Freedman of the Alameda Superior Court granted summary judgment in favor of Tessera and against UTAC, the defendant-licensee, on UTAC's patent misuse defense. Ex. 8. Judge Freedman explained that to prevail on a patent misuse claim, "UTAC would be required to prove coercion" and "UTAC has presented no evidence of coercion." *Id.*[5]

To obtain summary judgment Tessera merely needs to point out "that there is an absence of evidence to support" UTC's defense. *Brilliant Instruments, Inc. v. GuideTech, LLC*, 707 F.3d 1342, 1350 (Fed. Cir. 2013). Here, UTC has not presented and cannot present any evidence of coercion. This was an arms-length transaction between two sophisticated parties. D.I. 397 at 8:1. ████████

█████████████████████████████████████████████

█████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████ There is no evidence that Tessera coerced or conditioned the grant of the patent license upon a particular arrangement such as a worldwide or portfolio-wide scope, no evidence that UTC asked for a license on a different basis such as a license limited to particular geographies, and no evidence that Tessera refused to license UTC on any other basis. In deposition, ███████████████

██████████████████████████████████████████████████

███████████████████████████████████ ████████████████████

█████████████████████████████████████████████████

████████████ █████████ Because there is no record that Tessera insisted on a particular structure or that UTC made alternative proposals, there is no evidence that Tessera inflexibly rejected any such alternative proposals. Just as in *Powertech* and *UTAC*, in the absence of evidence of

---

[5] UTC is aware of the ruling on patent misuse in this state court case because its current counsel also represented its parent company, UTAC, in that matter. Ex. 8.

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

6672664

coercion, Tessera is entitled to summary judgment on patent misuse.

**B.      Courts Approve Of Licenses Providing For Royalties To Be Paid On A Worldwide Portfolio Basis.**

The Agreement, ██████████████████████████████████████ is a type of "portfolio license" that courts have approved time and again as an appropriate mechanism to achieve mutual convenience.  The Federal Circuit has explained that portfolio licensing "has the procompetitive effect of reducing the degree of uncertainty associated with investment decisions." *U.S. Philips Corp. v. ITC*, 424 F.3d 1179, 1192-93 (Fed. Cir. 2005) (describing the benefits of portfolio licensing).  In the semiconductor industry in particular, portfolio licenses are appropriate to "avoid the costly and inefficient endeavor of a patent-by-patent licensing scheme."  *Tex. Instruments, Inc. v. Hyundai Elecs. Indus.* ("*TI*"), 49 F. Supp. 2d 893, 901 (E.D. Tex. 1999) (dismissing affirmative defense of patent misuse); *see also Eastman Kodak Co. v. Asia Optical Co.*, *Inc.*, 2012 U.S. Dist. LEXIS 36157 (S.D.N.Y. Mar. 16, 2012) (rejecting patent misuse argument as to worldwide portfolio license).  In *Kimble v. Marvel Entm't, LLC*, 135 S. Ct. 2401 (2015), on which UTC relies, the Supreme Court reaffirmed the long-standing rule that licensing agreements that cover a portfolio of patents with royalties running until the last-to-expire patent, and agreements that cover nonpatent rights like technical know-how—██████████████████████████—are permissible and do not constitute patent misuse.  *Id.* at 2408 ("And parties have still more options when a licensing agreement covers either multiple patents or additional non-patent rights.  Under *Brulotte*, royalties may run until the latest-running patent covered in the parties' agreement expires.").  Indeed, less than two years ago Judge Wilken ruled on summary judgment that a Tessera license that licensed ***the same portfolio of patents*** to one of UTC's competitors did not constitute patent misuse.  *See Powertech*, 2014 U.S. Dist. LEXIS 5441; *Powertech Tech., Inc. v. Tessera, Inc.*, Case No. 10-CV-945 CW, D.I. No. 233 at 20-26 (N.D. Cal. March 31, 2013) (slip op.) (finding no patent misuse).

**C.      At Minimum, UTC's Cross-Motion For Summary Judgment Of Patent Misuse Must Be Denied.**

UTC purports to cross-move for summary judgment of no patent misuse.  UB § XII.  As discussed above, Tessera is entitled to summary judgment because of UTC's basic failure of proof of an essential element of the defense: coercion.  But even if the Court disagreed, UTC's motion cannot

be granted because UTC misstates the law and ignores disputed facts on other elements of the defense.

First, UTC's legal framework for its motion incorrectly asserts that Tessera has the burden of showing no misuse. UB at 21. Patent misuse is UTC's defense, however, and it is well-established that UTC has the burden of proof of all necessary elements. *See, e.g.*, *Alloc, Inc. v. ITC*, 342 F.3d 1361, 1375 (Fed. Cir. 2003); *Tech. Licensing Corp. v. Gennum Corp.*, No. C 01-04204 RS, 2007 U.S. Dist. LEXIS 35521, at *91 (N.D. Cal. May 4, 2007).[6] In addition, "[i]n cases where the party moving for summary judgment also bears the burden of persuasion at trial, the party's initial summary judgment burden is higher in that it must show that the record contains evidence satisfying the burden of persuasion and that the evidence is so powerful that no reasonable jury would be free to disbelieve it." *Surles v. Andison*, 678 F.3d 452, 455 (6th Cir. 2012). *See C.A.R. Transp. Brokerage Co. v. Darden Rests., Inc*., 213 F.3d 474, 480 (9th Cir. 2000); *Fantasyland Video, Inc. v. County of San Diego*, 373 F. Supp. 2d 1094, 1130 (S.D. Cal. 2005). Although UTC is the party with the burden of proof, its summary judgment motion identifies no evidence to support its patent misuse defense, let alone undisputed evidence sufficient to carry its burden. UTC also cites no cases in which any court has granted summary judgment of patent misuse. By contrast, Tessera has cited many cases granting summary judgment of *no* patent misuse, including in virtually identical circumstances involving the same patents.

Second, UTC also incorrectly suggests that it can obtain summary judgment by showing only that "a licensor such as Tessera … demand[s] royalties for products that are outside its patent rights…, unless the arrangement was agreed upon voluntarily for the parties' mutual convenience." UB at 21. In fact, as noted above, patent misuse requires proof of coercion, and this requirement applies where, as here, a party attacks a worldwide royalty provision on patent misuse grounds. *See, e.g.*, *Eastman Kodak*, 2012 U.S. Dist. LEXIS 36157, at *25 (S.D.N.Y. Mar. 16, 2012) ("Even assuming Kodak does not have relevant digital camera patents in China, the worldwide royalties provision of the AO Agreement does not constitute patent misuse . . . There is no assertion in either AO's pleadings or its

---

[6] UTC cites *Compton v. Metal Prods., Inc.*, 453 F.2d 38, 43-44 (4th Cir. 1971), for the proposition that Tessera has the burden of proof. *Compton* says nothing remotely of the sort; it contains no reference in words or substance to which party bears the burden.

summary judgment opposition papers that AO's agreement to pay a royalty on its total sales was either involuntary or the result of an improper use of market power by Kodak."). There is no evidence that Tessera made any "demand[] [for] royalties for products that are outside its patent rights" (UB at 21) through coercion.

UTC further misstates the law by suggesting that patent licenses must be coextensive with patent law, and that licenses requiring worldwide royalties without requiring a patent-by-patent analysis constitute patent misuse.[7] Courts have long recognized that basing royalties on something other than the precise legal requirements of patent law does not constitute misuse. *See, e.g. Automatic Radio*, 339 U.S. at 833-34 (finding no patent misuse because total sales of a given type of product may represent "the most convenient method of fixing the business value of the privileges granted by the licensing agreement" and "a convenient mode of operation designed by the parties to avoid the necessity of determining whether each type of [the licensee's] product embodies any of [the licensee's numerous] patents"); *Engel*, 96 F.3d at 1408 & n.2 (finding no patent misuse because parties may agree to total sales royalty in patent license agreement "if that provides a convenient means for measuring the value of the license"); *Tex. Instruments*, 49 F. Supp. 2d at 906 (dismissing patent misuse defense; worldwide portfolio licenses in semiconductor industry "do not require a patent-by-patent, country-by-country, product-by-product examination."); 1 Dratler at § 4.03[1][c] ("Nothing in patent law . . . requires that the royalty base in a patent license be defined by the patent claims."); Harold Einhorn & Eric Bensen, *Patent Licensing Transactions* § 3.04 (2012) ("a patentee is free in establishing a patent royalty to fix any base (absent unilateral coercion) that he desires, and the parties may adopt any convenient method for fixing the royalties to be paid").

---

[7] Even the cases UTC cites do not support this proposition. *See, e.g.*, *Zenith*, 395 U.S. at 138 (relied upon by UTC) ("If convenience of the parties rather than patent power dictates the total-sales royalty provision, there are no misuse of the patents and no forbidden conditions attached to the license."); *Zila*, 502 F.3d at 1025 (holding that definition-based royalties such as royalties on a "car" are enforceable, such that the contract royalty obligation was not limited to the patent).

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

6672664

Third, even under UTC's erroneous legal standard, it would not be entitled to summary judgment of patent misuse unless there was no dispute of material fact that "the arrangement was agreed upon voluntarily for the parties' mutual convenience." UB at 21. UTC simply ignores the many disputed facts regarding whether the royalty structure of the Agreement was entered into for the parties' convenience. For example, Tessera's licensing expert, Harry Gwinnell,

**IRELL & MANELLA LLP**
A Registered Limited Liability
Law Partnership Including
Professional Corporations

6672664

- 13 -

███████ .[8]

## III.   UTC IGNORES THE SUBSTANTIAL EVIDENCE SUPPORTING DR. BRAVMAN'S OPINION THAT SOLDER BALL PADS ARE "TERMINALS."

UTC seeks summary judgment of non-infringement, claiming that there is "no competent evidence" that the solder ball pads in the accused products qualify as "terminals."  UB at 4-5.  UTC argues that only the conductive solder ball structures attached to those pads can be terminals.  *Id.* UTC, however, ignores that the Court adopted Tessera's construction of this term ("end points for connection of the package to the outside").  In rejecting UTC's position, the Court explained that "terminals" could not encompass "conductive structures attached to the outside of the packages," and cited "heat activated joining units" – *i.e.*, solder balls – as an example of a conductive structure attached to the outside of the packages.  D.I. 384 at 13 (citing '480 at 13:62-14:3 ("an aperture could be created … to expose such terminals for attachment of heat activated joining units")).



---

[8] UTC attempts to argue that the contract is not administratively convenient because of a purported contradiction in positions that Tessera took in an ITC proceeding.  UB at 22.  UTC fails to bring to the Court's  attention that this argument, which Tessera lost, did not involve products on which licensees had paid royalties.  *See* Ex. 12 ¶ 9; *Powertech*, 2014 U.S. Dist. LEXIS 5441, at \*5 ("The 630 Investigation Complaint explicitly excluded any properly-licensed products manufactured by respondents.").  UTC's claim of a contradiction makes no sense and at most would be an additional point of disputed fact.

[9] UTC repeatedly proclaims that Tessera has offered "no competent evidence" in support of certain infringement contentions for which Tessera has, in fact, already provided extensive expert testimony. UTC cannot simply ignore the evidence from Tessera's technical that it knows exist.   Expert reports and expert deposition testimony can, and here do, raise genuine issues of material fact.  *See Brilliant Instruments, Inc. v. GuideTech, LLC*, 707 F.3d 1342, 1345 (Fed. Cir. 2013) (finding that patentee's expert report raised a genuine issue of material fact); *Charles Mach. Works, Inc. v. Vermeer Mfg. Co.*, 723 F.3d 1376, 1380 (Fed. Cir. 2013) ("For purposes of summary judgment, we must accept [patentee's] expert's factual assertions as true, and we hold that they raised genuine factual disputes material to the . . . inquiries.").  Summary judgment cannot be granted over an expert's infringement testimony "unless the expert's methodology is clearly flawed, his or her conclusions are legally insufficient to support a verdict, or her conclusions are clearly unreasonable." *Geotag, Inc. v. Frontier Communs. Corp.*, No. 2:10-CV-00265-JRG, 2014 WL 341802, at \*6 (E.D. Tex. Jan. 30, 2014).

A broad array of evidence supports Dr. Bravman's opinion and defeats summary judgment, beginning with the patents themselves. The patents make clear that "terminals" and solder balls are distinct structures—solder is applied to the terminals in order to connect the package to other external elements such as a printed circuit board. *See, e.g.*, '480 at 3:40-42 ("The package terminals are then connected to a PWB typically by using heat activated joining units, such as solder balls or solid core solder balls."); '587 at 6:11-15 ("After testing, the assembly is bonded to a substrate such as a circuit panel (not shown), so that each connecting terminal 36 is bonded to a contact pad on the substrate using solder or other suitable bonding material."); D.I. 215 at 18-19 (collecting citations to patents); *see also* D.I. 384 at 13-14 (finding terminals and "any conductive structure attached to the outside of the package" as distinct).



IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

6672664

UTC disregards all of this evidence as well.

Every other tribunal to have considered the issue has confirmed this usage. For example, the ITC explained that in BGA packages "the 'endpoint for electrical and mechanical connection of the chip package to the outside' is the solder ball pads, not the solder balls themselves." Ex. 14 at 49-50. As the ITC held, the intrinsic evidence "clearly distinguishes the terminals from the solder balls, which are the means of mechanically and electrically connecting the terminals to the outside." *Id* at 49-50. *See also, e.g.*, Ex. 15 at 54 ("One of ordinary skill in the art would understand that the terminal itself could not be made of solder…."), 64 ("On the package substrate there are also terminals, sometimes referred to as 'lands,' to which solder balls are attached.").

UTC's assertion that it "would make no sense" to call something a BGA "package" if it did not have solder balls attached even contradicts its own counsel's usage.

Similarly, at the Markman hearing, UTC's counsel argued that "the key" to one of UTC's arguments was that particular layers "allow relative movement of the package terminals and the absorbed strain within that compliant material rather than in the fragile solder balls." Ex. 21 at 104:14-16. Yet the same counsel is now arguing that terminals and solder balls are one and the same.

Every claim of both of those patents requires a "terminal." '627; '304. That course of conduct underscores not only that UTC's wBGA packages have terminals, but that UTC has believed as much for over a decade.

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations   6672664

- 16 -

## IV.   UTC'S ARGUMENTS ABOUT THE '587 PATENT ARE LEGALLY IMPERMISSIBLE AND FACTUALLY CONTESTED.

UTC's arguments about claim 1 of the '587 Patent depend on imagined limitations that neither the claim nor any claim constructions contain.  As background, the term "connecting at least some of said contacts with at least some of said bonding terminals by a plurality of flexible leads while supporting said bonding terminals against vertical movement towards said front surface of said element to facilitate said connection" was offered for construction.  *See* D.I. 203-1 at 10.  UTC proposed a construction that would have added a requirement of providing "rigid resistance against vertical movement."  *Id.*  During claim construction, Tessera explained why UTC's proposal sought to add an extraneous limitation, and further conflated preferred embodiments with claim requirements. D.I. 215 at 14-16.  In response, UTC changed its proposal to one that added a different requirement – "providing support in the area of bonding terminals such that this area is more rigid, or less compliant or flexible, than the area where the contact terminals are located."  D.I. 218 at 27-28.  But this construction failed for the same reasons as its predecessor.  *See* D.I. 215 at 15-16; D.I. 228 at 10-11. Now, UTC makes a third improper proposal.  UTC contends that a new limitation should be added that requires "doing something specific and different to provide support in the bonding terminal area." UB at 6-8.  This language is simply not part of the claim, which cannot be rewritten.  *See* D.I. 384 at 12 (citing *Am. Piledriving Equip., Inc. v. Geoquip, Inc.*, 637 F.3d 1324, 1331 (Fed. Cir. 2011) ("where a claim term does not include a limitation . . . it is improper to read such a limitation into the claims.").

Even more remarkably, UTC then criticizes Tessera for "ignoring" UTC's new assertion that claim 1 "requires" "providing specific support for the bonding terminals against vertical movement during wire bonding," and asks that summary judgment of noninfringement be granted on that basis. UB at 7-8. ██████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████[10]  Those

---

[10] ████████████████████████████████████████████████████████████
████████████████████████████████████

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional  Corporations

6672664

- 17 -

opinions are supported by an extensive factual record (*e.g.*, Ex. 13 at 96:8-11, 126:5-23, 130:1-16, 130:17-24, 131:3-5; Ex. 22 at 203:11-12, 219:19-24; Ex. 23 at -568; Ex. 24, particularly at -139) and were thoroughly backed up when Dr. Bravman was questioned about them (*e.g.,* BD1 at 140:23-141:14, 143:10-144:6, 144:7-17, 149:3-150:2, 150:10-151:2, 152:16-153:19).  That evidence establishes infringement of the claim as written, and is consistent with the specification, which makes clear that doing something "specific or different" in the bonding terminal region is not required.  *See, e.g.*, '587 at 8:35-39  ("the entire interposer top layer, including both the bonding terminal regions and the connecting terminal regions can be substantially rigid, but supported …by a compliant layer").

UTC additionally argues that "Tessera cannot permissibly point to the same features in UTC's wBGA as constituting **both** the features that the '587 acknowledges as prior art **and** as the supposedly new and different invention that it purports to claim."  UB at 8 (emphasis in original).  But this argument is legally impermissible and myopic.  First, it is well-settled that a product can fall within the claims of both prior art and an asserted patent without the asserted patent being invalid.  If UTC's argument were true, improvements to existing technology would not be patentable.  But it is well-settled that improvements are patentable, including when implemented in a product that also uses preexisting technology.  *Cantrell v. Wallick*, 117 U.S. 689, 694 (1886); *Martin v. Ford Alexander Corp.*, 160 F. Supp. 670, 674 (S.D. Cal. 1958) ("[A] patent for an invention does not avoid a later patent for an improvement thereon nor does a patent for an improvement avoid a later patent for the invention on which the improvement is made.").[11]  Second, UTC focuses on a single feature of a multi-element invention, ignoring that in evaluating validity "[e]ach claimed invention must be considered as a whole."  *W.L. Gore & Associates, Inc. v. Garlock, Inc.*, 721 F.2d 1540, 1548 (Fed. Cir. 1983).

UTC then conversely contends that if it infringes claim 1 of the '587, the claim must be invalid.  *See* UB at 8 ("If Tessera's infringement contentions were permitted to cover UTC's packages, then the

---

[11] UTC also contends that if Tessera's infringement contentions were credited, "its patents would all cover the same thing and could not possibly be valid."  UB at 3.  This is another logical fallacy.  While two patents cannot validly claim exactly the same invention, it is elementary that a single product can contain multiple inventions and can therefore infringe multiple patents.  *See Milliken Research Corp. v. Dan River, Inc.*, 739 F.2d 587, 594 (Fed. Cir. 1984) ("a product may infringe more than one patent").  Each patent asserted by Tessera is different from the others, in ways that UTC ignores.

'587 patent would necessarily be anticipated by the prior art Khandros Patents."). The premise of this argument – which is also the premise of most of the other arguments that UTC raises in this motion – is flatly contrary to settled law. *See Zenith Elecs. Corp. v. PDI Commc'n Sys., Inc.*, 522 F.3d 1348, 1363 (Fed. Cir. 2008) (finding legally impermissible argument that, "to the extent the allegedly infringing PDI P20LCD is considered to practice [claim limitations], then so did the [prior art] RCA J20525 television."). Infringement and invalidity are "entirely separate questions," with different burdens of proof. *Pandrol USA, LP v. Airboss Ry. Prods., Inc.*, 320 F.3d 1354, 1365 (Fed. Cir. 2003). Because infringement is established under the "the less stringent preponderance of the evidence standard . . . mere proof that the prior art is identical, in all material respects, to an allegedly infringing product cannot constitute clear and convincing evidence of invalidity." *Zenith*, 522 F.3d at 1363; *see also Tate Access Floors, Inc. v. Interface Architectural Res., Inc.*, 279 F.3d 1357, 1366 (Fed. Cir. 2002) ("[A]ccused infringers are not free to flout the requirement of proving invalidity by clear and convincing evidence by asserting a 'practicing prior art' defense to literal infringement under the less stringent preponderance of the evidence standard."). Thus, in *Zenith*, the Federal Circuit reiterated: "Anticipation requires a showing that each element of the claim at issue, properly construed, is found in a single prior art reference. It is the presence of the prior art and its relationship to the claim language that matters for invalidity. . . . [T]he defense of noninfringement cannot be proved by comparing an accused product to the prior art." 522 F. 3d at 1363; *see also Tate*, 279 F.3d at 1366 ("[L]iteral infringement is determined by construing the claims and comparing them to the accused device, not by comparing the accused device to the prior art.").

Further, "Anticipation requires a showing that each element of the claim at issue, properly construed, is found in a single prior art reference." *Id.* at 1363. Here, UTC relies on the '977 reference.[12] But in place of the required element-by-element analysis, UTC invites the Court to generally compare "features" of figures in two patents. *See* UB at 8 ("The '977 prior art patent also discloses the same features, as illustrated by the same drawing that appears in the '587 patent.

---

[12] The only "Khandros Patents" UTC elected to assert as prior art are the '627 and '977 patents. D.I. 387; *see also* Ex. 2 at 7. Yet UTC now improperly contends that the '265 and '861 patents invalidate claim 1 of the '587 patent. UB at 6-8. In any event, UTC has failed to show that *any* reference discloses each element of claim 1 of the '587 patent.

*Compare* '977 Patent, Fig. 13 *with* '587 Patent, Fig. 8."). The issue is whether every ***element of claim 1*** is disclosed by an embodiment in the '977 Patent, not whether features of ***a figure*** in the '587 Patent are shown in prior art. Furthermore, these are just arguments by counsel. UTC fails to cite any expert opinion establishing that every element is disclosed by the '977 Patent. *See Abraham v. Super Buy Tires, Inc.*, 2007 WL 1450311, at *5 (S.D. Cal. May 15, 2007) (denying invalidity motion where defendants "offer[ed] no expert opinion on invalidity, only attorney argument").

Indeed, the '977 patent teaches nothing about the need to provide support to the bonding terminals, a concept discussed at length in the '587 patent. By contrast, the '587 patent teaches providing support including (as in the UTC packages) how to use a stronger interposer along with a compliant layer. '587 at 8:35-39.

V.   **UTC'S FLURRY OF ARGUMENTS ABOUT THE '611 PATENT IGNORE THE COURT'S MARKMAN ORDER, ELEMENTARY PRINCIPLES OF LAW, AND EXPERT OPINIONS OF RECORD.**

UTC argues that it does not infringe the '611 because in its

This straightforwardly rehashes an argument that UTC already made and the Court already rejected. *Exergen Corp. v. Wal-Mart Stores, Inc.*, 575 F.3d 1312, 1321 (Fed. Cir. 2009) ("Once a district court has construed the relevant claim terms . . . that legal determination governs for purposes of trial. No party may contradict the court's construction to a jury."). During claim construction, UTC argued that "Claim 1 expressly requires that this 'chip carrier' component have terminals and leads attached to it—separate

and apart from, and prior to, whatever may be done with it." D.I. 218 at 23; *see also* Ex. 21 at 129:1-130:3 ("It's not saying first get yourself a chip carrier and the later step in the claim says and then add some leads and then the later claim says and then add some terminals. It says provide a chip carrier that has these things on it."). The Court rejected this argument, finding that "Claim 1 does not recite an ordering limitation." D.I. 384 at 15 (citing *Altiris, Inc. v. Symantec Corp.*, 318 F. 3d 1363, 1369 (Fed. Cir. 2003) ("UTC proposes that the structure cannot be a chip carrier unless certain electrical connections have been made before the chip carrier is connected to a chip . . . However, Claim 1 does not recite an ordering limitation and 'unless the steps of a method actually recite an order, the steps are not ordinarily construed to require one.'").



**13**

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

6672664

- 21 -



UTC's invalidity argument regarding the '611 Patent rests on the erroneous supposition that "to accept Tessera's infringement theory is to invalidate Claim 1." UB at 11. But as addressed in Section III, this form of argument is contrary to settled law. In a further attempt to shortcut the element-by-element invalidity analysis required by law, UTC asserts, without citation to expert testimony, that "the '611 Patent itself states that the prior art Khandros Patent discloses a package having the features that result from the assembly method recited in Claim 1." UB at 11. This assertion is so contrary to fact that even UTC's expert was unable to support it, as Dr. Bravman has explained in detail – an explanation UTC simply ignores.

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional  Corporations



8340   8303   y

y   pp   p

p   8340'

Thus as a matter of law UTAC cannot establish anticipation. *See Transclean Corp. v. Bridgewood Servs., Inc.*, 290 F.3d 1364, 1373 (Fed. Cir. 2002) ("anticipation by inherent disclosure is appropriate only when the reference discloses prior art that must necessarily include the unstated limitation").

## VI.   UTAC FAILS TO ESTABLISH NONINFRINGEMENT OF THE '272, '952, '328, AND '480 PATENTS.

UTAC argues, for various reasons, that it does not infringe the '272, '952, '328, and '480 patents.  Each argument is either legally improper or mired in disputed issues of fact—or both.

### A.   "Compliant Pads" Are Present In The Royalty-Bearing Products

UTC ignores all of that evidence – which independently prevents summary judgment – in favor of unsupported arguments based on claim construction positions already raised and denied.

But

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

6672664

the Court already rejected this exact argument during claim construction. D.I. 384 at 9-11. UTC argued for a construction stating that "[a] 'compliant pad' is distinct from a 'compliant layer.'" D.I. 218 at 17-18. As the Court found, UTC's construction was "contrary to the plain claim language and the specification." D.I. 384 at 9-10. ████████████

███████████████████████████████████

███████████████████████████████████

████████████████████████████

UTC also contends that if the die attach is "an extremely thin layer of epoxy adhesive" it cannot be not a "pad." UB at 13. But here again, UTC is just rehashing another already-rejected claim construction argument. UTC argued for a construction requiring that the "compliant pads" be "non-sheetlike." *See* D.I. 218 at 17-18. However, as the Court found, no negative limitation of the sort is recited in the claims, and adding one would exclude a preferred embodiment from the patent. D.I. 384 at 10 ("A person having skill in the art could include other bodies based on the preferred ratio to be sheet-like (e.g., a very flat structure having a width that is many multiples of its height)"); *see also id* at 16 ("Furthermore, a construction that excludes a preferred embodiment described in the specification 'is rarely, if ever correct and would require a highly persuasive evidentiary support.'").

████████████████████████████████

███████████████████████████████████

███████████████████████████████

████ But none of these extraneous functional "limitations" is present in the claims UTC addresses or the Court's construction. Where particular dependent claims have associated requirements, they recite them expressly and ████████████████

███████████████████████████████████

██████████████████████████████████

██████████████████████████████████

██████████████████████████████████

██████████████████████████████████

██████████████████████████████████

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

6672664

- 24 -



### B. "Encapsulant Surrounding" Is Present In the Royalty-Bearing Products

Claim 1 of the '328 patent requires a semiconductor package "comprising" "a composite layer between the chip unit and the substrate." The Court construed the full limitation as follows: "an encapsulant surrounding one or more [compliant] pads . . . so that the encapsulant and one or more [compliant] pads . . . form a layer made of distinct parts between the chip unit and the substrate." Claim 1 of the '480 patent contains a similar requirement that was construed similarly. D.I. 384 at 21.

Nonetheless, UTC now argues that the *entirety* of the materials used in the composite layer – including any extensions of those materials anywhere in the package – must also be within the periphery of the chip.

**IRELL & MANELLA LLP**
A Registered Limited Liability
Law Partnership Including
Professional Corporations

6672664

- 25 -



### C.    "Channels" Are Present In The Royalty-Bearing Products



" Although the pads are described as being "attach[ed]" to the support structure, the channels are described as being defined by adjacent pads. *Id.* This is exactly how the Court construed the term, rejecting UTC's argument that "the channels, too, must be located between the chip and support structure." *See* D.I. 384 at 11 ("Here, the plain language of the claim describes pads arranged such that there is space between adjacent pads into which liquids can be introduced.").

### D. "Alignment" Is Present In The Royalty-Bearing Products

Yet again, here, UTC relies on "limitations" it has added to the claims for purposes of concocting an argument. *Compare* UB at 14-15 *with* '272 claim 1; *see also* RU2 ¶ 124 (same). To begin with, this apparatus claim does not contain an "intent" requirement and one should not be added. *See, e.g.*, *TriQuint Semiconductor, Inc. v. Avago Techs. Ltd.*, No. CV-09-1531-PHX-JAT, 2012 WL 1432529, at *9 (D. Ariz. Apr. 25,

**IRELL & MANELLA LLP**
A Registered Limited Liability
Law Partnership Including
Professional Corporations       6672664

2012) (refusing to incorporate "motivation or intent" into an apparatus claim).

The claim requires that "*said* terminals being aligned with at least some of said pads." '272 claim 1. Without explanation, UTC removes the words "said" and "a plurality of" from its reproduction of the claim language. *See* UB at 14. "Said terminals" refers back to "a plurality of terminals" introduced in claim 1. *Raylon, LLC v. Complus Data Innovations, Inc.*, 700 F.3d 1361, 1376 (Fed. Cir. 2012) ("As our cases require, 'said' refers back to an earlier use of that term in the claim."). And a "plurality of terminals" refers to "more than one" terminal, not every terminal in the accused packages. *See York Prods., Inc. v. Cent. Tractor Farm & Family Ctr.*, 99 F.3d 1568, 1575 (Fed. Cir. 1996) ("The term means, simply, 'the state of being plural.'"). In other words, "said terminals being aligned with at least some of said pads" refers to "a plurality of terminals" being aligned, not every last terminal in every package. This plain reading is reinforced by the open-ended transition term "comprising." *Genentech, Inc. v. Chiron Corp.*, 112 F.3d 495, 501 (Fed. Cir. 1997) ("'Comprising' . . . means that the named elements are essential, but other elements may be added and still form a construct within the scope of the claim.").

## VII.   UTAC FAILS TO ESTABLISH NONINFRINGEMENT OF THE '952 PATENT

UB at 15. UTC is wrong for numerous reasons. First, Claim 34 of the '952 Patent is a "comprising" claim that does not exclude processes with additional steps.

. *Invitrogen Corp. v. Biocrest Mfg., L.P.*, 327 F.3d 1364, 1368 (Fed. Cir. 2003) ("The transition 'comprising' in a method claim indicates that the claim is open-ended and allows for additional steps.")

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

6672664



*KCJ Corp. v. Kinetic Concepts, Inc.*, 223 F.3d 1351, 1356 (Fed. Cir. 2000) ("'[A]' or 'an' in patent parlance carries the meaning of 'one or more' in open-ended claims containing the transitional phrase 'comprising.'").

Third, the claim recites "providing . . . a plurality of terminals" and then "electrically connecting each terminal"; "each terminal" refers to each terminal in the "plurality of terminals," not necessarily every terminal in the package. *Wonderland Nurserygoods Co., Ltd. v. Kids II, Inc.*, 2014 WL 2094295, *3 (N.D. Ga. May 20, 2014) ("'[T]he 'plurality of side panels' does not mean all the side panels.  Accordingly, the Court will construe 'a plurality of side panels' as 'at least two of the side walls of the bassinet.'");

Fourth, UTC ignores the evidence showing infringement of the claim as construed.

[16].

## VIII.   UTC FAILS TO ESTABLISH INVALIDITY OF THE '952, '272, '480, OR '328 PATENTS

As a threshold matter, UTC's various invalidity claims are legally irrelevant to its contractual

---

[16] UTC's doctrine of equivalents arguments are premature, particularly in light of UTC's still-shifting and not-fully-disclosed noninfringement and invalidity positions.  As detailed throughout this brief, for instance, UTC is still continuing to reveal new noninfringement arguments.  If UTC is permitted to present new arguments at this stage, as it continues to do, then Tessera should not be foreclosed from responding appropriately.

royalty obligations in this case and need not be adjudicated at all, as explained in Section I. Nonetheless, if UTC's arguments concerning the validity of the '272, '328, '480, and '952 patents were considered, they would fail for many additional, independent reasons. UTC's motion, for instance, disregards numerous disputed issues of material fact concerning what UTC's references disclose. *Yoon Ja Kim v. ConAgra Foods, Inc.*, 465 F.3d 1312, 1326 (Fed. Cir. 2006) ("The determination of what a prior art reference discloses is a question of fact."). UTC does not even try to confront in Section XI of its brief any of the extensive testimony of Dr. Bravman that is contrary to its assertions; instead, UTC impermissibly relies on attorney argument (often providing citations to the patent never discussed by its expert Ulrich) in an attempt to skip over gaps and inconsistencies in its own expert's testimony.[17] *Invitrogen Corp. v. Clontech Labs.*, 429 F.3d 1052, 1068 (Fed. Cir. 2005) ("Unsubstantiated attorney argument regarding the meaning of technical evidence is no substitute for competent substantive expert testimony. It does not, and cannot, support [defendants'] burden on summary judgment.").

And UTC repeatedly relies on the '627 and '977 references—Tessera's own patents—to argue obviousness, even though that is plainly prohibited. UB at 16-17, 18-20; *see also id.* at 2, 8, 11. Statutory law bars many of these contentions. 35 U.S.C. § 103(c) (pre-AIA, applying to applications filed before March 16, 2013: "Subject matter developed by another person, which qualifies as prior art only under one or more of subsections (e), (f), and (g) of section 102, shall not preclude patentability under this section [103] where the subject matter and the claimed invention were, at the time the claimed invention was made, owned by the same person . . . .."). For example, UTC cannot use Tessera's '977 patent to assert obviousness of Tessera's '480 or '272 patents, because the '977 patent does not qualify as prior art under § 102(a)-(d) and the patents were all owned by Tessera.

**A.     UTC Has Not Established That '952 Claim 34 Is Invalid.**

"providing a support structure having a first and a second surface":

---

[17] In addition to ignoring claim elements and misconstruing prior art disclosures, Ulrich impermissibly mixed features of the references' distinct embodiments. *Net MoneyIN, Inc. v. VeriSign, Inc.*, 545 F.3d 1359, 1369-70 (Fed. Cir. 2008) (to anticipate, a reference must not only disclose all claim elements, but "must also disclose those elements arranged as in the claim.").

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

6672664



UTC's attorney argument cannot fix these intractable problems at all, let alone on summary judgment.[18] *See, e.g.*, *Joyal Products, Inc. v. Johnson Elec. N. Am., Inc.*, No. CIV.A.04-5172 (JAP), 2008 WL 4630500, at *4 (D.N.J. Oct. 17, 2008) ("The attorney argument in Defendants' brief cannot take the place of, for example, evidence of how one skilled in the art would perceive the referenced prior art.  Consequently, Defendants cannot carry their burden on summary judgment.").

"attaching a plurality of compliant pads to the first surface of the support structure":

---

[18] Here UTC's counsel cites '627 at 3:49-61 and 7:23-26 to argue what the reference "teaches" or "discloses."  UB at 17.  Neither passage was discussed by Ulrich, nor did he ever discuss the role of a "securement element."

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional  Corporations

6672664



Nevertheless, UTC contends that "because the use of multiple compliant pads or a single continuous layer with multiple holes were known options, either would have been an obvious design choice."  UB at 17.  First, ████████████████████████████████ would not establish obviousness, even if that was the only record evidence. *See ActiveVideo Networks, Inc. v. Verizon Commc'ns, Inc.*, 694 F.3d 1312, 1327 (Fed. Cir. 2012) (denying JMOL where the expert's testimony on obviousness was essentially a conclusory statement that a person of ordinary skill in the art would have known, based on the 'modular' nature of the claimed components, how to combine any of a number of references to achieve the claimed inventions."). 

████████████████████████████████████████████████████████████████████████████████████████████ UTC ignores this all.

"the pads defining channels therebetween": UTC relies on "four elongated slots" in an attempt to establish this element.

---

[19] UTC's counsel cites '627 at 24:37-42 to argue what the reference "teaches" or "discloses."  This passage was not discussed by Ulrich, nor did he ever discuss the role of a "securement element."

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

6672664



UTC's argument—riddled with new citations and unsupported attorney argument—also improperly mixes disclosures from various embodiments of the '627.  UB at 17.[20]  In any event, the "slot" argument fails because UTC admits that its supposed "slot" is defined between a securement element and the interposer, not between adjacent pads as required by the claim.  UB at 17.

"abutting the first chip surface against the compliant pads":  UTC's contention that Fig. 16 discloses this limitation is pure attorney argument.

"disposing a liquid between the channels after the abutting step":  UTC offers no evidence regarding this step, *see* UB at 17-18, and

"whereby the semiconductor chips and the support structure define a single assembly":  UTC, like Ulrich, fails to establish that this limitation is disclosed by the '627 patent.

**B.     UTC Has Not Established That '272 Claims 1, 3, 6, And 19 Are invalid.**

**1.     Claim 1 is valid**

---

[20] UTC's counsel cites '627 at 10:40, 23:9-12, and 23:37-39 to argue what the reference "teaches."  UB at 17.  But these passages were never discussed by Ulrich, nor did he ever discuss Fig. 17.

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional  Corporations

6672664

"a plurality of non-conductive, compliant pads disposed between said terminals and said structure": Here again, UTC ignores



Further, the '977 patent is not a proper obviousness reference, *see* Section VIII, and even it if was, the use of multiple pads would not have been obvious, *see* Section VIII.A.[21]

**2.      Claim 3 is valid**

"said compliant pads being disposed between said terminals and said face surface of said first semiconductor chip": UTC ignores

.[22]

**3.      Claim 6 is valid**

"flexible leads extending between said terminals and said chip": UTC offers no evidence that this limitation is disclosed under UTC's construction of the term "flexible" (the term was not construed in the *Markman* order).

.[23]

**4.      Claim 19 is valid**

"wherein said pads are of substantially uniform shape and size": UTC's contentions concerning what is disclosed by Fig. 16 and 17 are pure attorney argument. UB at 19.[24]

---

[21] UTC cites '977 at 17:66-18:2 to argue what the reference "teaches." But this passage was not discussed by Ulrich, nor did he refer to 8303 and 8340 as "compliant layers" at RU1 at A-6 at 7.

[22] Here, UTC cites '977 at 24:11-15 to argue what the reference "teaches" or "discloses." UB at 18-19. But this passage was not discussed by Ulrich either. *See* RU1 at A-6 at 12-15.

[23] UTC cites '977 at claim 1 and 23:27-29 to argue what the reference "teaches" or "discloses." UB at 19. But this text was not discussed by Ulrich. *See* RU1 at A-6 at 15-16.

[24] This new attorney argument also conflicts with testimony of Dr. Bravman. *See, e.g.,* BR2¶¶ 1030-36. *See also Immersion Corp. v. HTC Corp.*, No. CV 12-259-RGA, 2015 WL

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

6672664

████████████████████████████████████████████████████

████████████████████████████████████████. *See, e.g.*, BR2 ¶¶ 461-67.

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████████

███████.[25]

### C.    UTC Has Not Established That '480 Claims 1, 9, And 11 Are Invalid.

#### 1.    Claim 1 is valid

"juxtaposing at least one compliant pad with the first surface": UTC's assertion of invalidity based on its interpretation of Tessera's infringement contentions is impermissible.  UB at 19; *see* Section IV.  Moreover, ████████████████████████████████

████████████████████████████████████████████████████

████████ ████.[26]  UTC also jumps from one embodiment to another without explanation.  UB at 19-20 (mixing the embodiments in Figs. 2, 16, and 17).  This cannot be done in an anticipation analysis, Section VIII, and obviousness cannot be based on Tessera's own '977 patent, *id*.

"disposing an encapsulant around said at least one compliant pad": UTC again impermissibly relies on Tessera's infringement contentions to argue invalidity.  ███████████████████

█████████████████████████████████

████████████████████████████ *see also* Section IV.  UTC also ignores ████

████████████████████████████████████████████

¶████████████████████████████████████████

████████████████████████ UTC contends that this limitation is

---

627425, at *2 (D. Del. Feb. 11, 2015) (denying summary judgment of invalidity where attorney argument conflicted with expert testimony).

[25] UTC cites '977 at 23:27-29 and Figs. 16 and 17 to argue what the reference "teaches" or "discloses."  UB at 19.  But these portions were not discussed by Ulrich.  *See* RU1 at A-6 at 15-16.

[26] UTC relies on '977 at 23:27-31:17 for its argument.  UB at 19-20.  But this text was not discussed by Ulrich.  *See* RU1 at E-6 at 7-9.

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional  Corporations

6672664

disclosed by Figs. 16 and 17.  UB at 20 (citing 24:31-34).  But UTC admits that rather than be disposed "around" at least one compliant pad, as required by the claim, encapsulant is only disposed into slots *in* the compliant pad. *Id.* ("the '977 patent discloses disposing encapsulant in *each of the empty spaces within the compliant pad* to form a composite layer").  As to Fig. 2, UTC admits that the '977 patent only discloses "disposing encapsulant in each of the empty spaces *within* the compliant pad," not around it. *Id.*; ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

"wherein the encapsulant has a second CTE that is lower than the first CTE": It is undisputed that the '977 patent does not expressly disclose this limitation. *See* BR2 ¶ 1386.  Instead, UTC relies on Ulrich's contention that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮).  But what is "typical" is insufficient as a matter of law to establish that the '977's encapsulant *inherently* has a CTE that is lower than that of the compliant pad. *Trintec Indus., Inc. v. Top–U.S.A. Corp.*, 295 F.3d 1292, 1295 (Fed. Cir. 2002) ("Inherent anticipation requires that the missing descriptive material is 'necessarily present,' not merely probably or possibly present, in the prior art."); ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.  And to the extent UTC contends this limitation was obvious, use of Tessera's own '977 patent is improper.

### 2.     Claims 9 and 11 are valid

"the method of claim 1": Claims 9 and 11 depend from claim 1, which as explained above UTC has not established is disclosed by the '977 patent. *See also* BR2 ¶¶ 1405-6.

"wherein at least some of the terminals are located beyond a periphery of the chip": Contrary to UTC's assertion, Tessera has never conceded that the '977 patent discloses claim 11.  By pointing to Fig. 16 as allegedly disclosing claim 11's added limitation, UTC again mixes and matches embodiments. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮; *see also* Section VIII (to anticipate, reference must

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

6672664

disclose elements arranged as in the claim).

**D.      UTC Has Not Established That '328 Claims 1 And 6 Are Invalid.**

"[O]ne or more compliant pads … surface" is absent for the same reasons as the "juxtaposing" element of '480 claim 1, discussed above. ████████████████ "[A]n encapsulant … pads . . ." is absent for the same reasons as the "disposing" element of '480 claim 1, discussed above. *See also* BR2 ¶ 1731-32.  And "[S]aid encapsulant … CTE" is absent for the same reasons as the "wherein" element of '480 claim 1, discussed above. *See also* BR2 ¶ 1738-40.  The requirements of Claim 6 are absent because, *inter alia*, they include the above-discussed requirements of claim 1. *See also* BR2 ¶ 1751.

**IX.      UTC OWES ROYALTIES FOR TCC PACKAGES MADE, SOLD, AND TRANSFERRED BY UTC IN CONNECTION WITH UTC MODULES**

UTC requests summary judgment that it does not owe royalties on w-BGA packages that it mounts onto memory module boards or "modules." UB § XIII. ████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████ *Id.* The packages on both types of modules are royalty-bearing and substantial factual disputes preclude summary judgment on this issue.

**A.      UTC Owes Royalties On TCC Packages It Made And Installed Onto Modules**

The Agreement obligates UTC ████████████████████████████

████████████████████████████████ Agmt. ¶ III.B; BD1 at 190:23-191:7.  UTC's documents show over ████████ (excluding interest) in unpaid royalties for royalty-bearing ████████

████████████████████████████████ . *E.g.*, MR ¶¶ 36, 38-39, Att. C-8 (updated); GR ¶ 48; BR1 ¶ 133; Ex. 22 at 243:9-11.  Even UTC does not deny that it owes royalties on ████████

████████████████████████████ s. UB § XIII.  Rather, UTC asserts only that these packages have already been accounted for in UTC's summary sales spreadsheets and thus should not be counted again. *Id.*  The record does not support this assertion.

First, UTC has not produced a single document supporting its claim that these packages were already accounted for in UTC's summary sales spreadsheets, despite Tessera's numerous requests. *E.g.*, MR ¶ 38; Ex. 27; RK ¶ 2.  Instead, ████████████████████████████████████

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional  Corporations

6672664

- 37 -

███████ Exs. 28, 29.  Second, even UTC's own damages expert, James Malackowski, admitted that ████████████████████████████████████████████████████████████████████████. *E.g.*, Ex. 30 at 180:4-21.  ████████████████████████████████████████. Ex. 31 § 13.4, fig. 35.  Third, ████████████████████████████████████████████████████████████. *E.g.*, TR ¶ 111; Ex. 32.

There is no evidence supporting UTC's assertion that any module packages were already accounted for in UTC's summary damages spreadsheets.  The conclusory declaration of UTC's Julia Hsu does not change this fact.  UB § XIII; Hsu Decl.  Ms. Hsu's unsupported one-sentence assertion, backed by not a single document, is not credible or admissible.  At her deposition, ███████████ ████████████████████████████████████████ Ex. 33 at 49:21-52:20, 61:24-65:7.  Moreover, UTC's counsel repeatedly impeded the witness from answering Tessera's questions about this subject.  *E.g.*, *id.* at 54:8-60:18.  Ms. Hsu's declaration cannot be considered for purposes of summary judgment.  *See Martinez v. Marin Sanitary Serv.*, 349 F. Supp. 2d 1234, 1243-44 (N.D. Cal. 2004) (rejecting conclusory declaration that was inconsistent with deposition testimony); *Super Future Equities, Inc. v. Wells Fargo Bank Minn., N.A.*, 2007 WL 4410370, at *7-8 (N.D. Tex. Dec. 14, 2007) (excluding declaration where corporation disclaimed knowledge during 30(b)(6) deposition).

**B.      UTC Owes Royalties On Packages It Asserts Were Initially Assembled By Others**

UTC also owes Tessera a separate sum of over ███████ (excluding interest) in unpaid royalties for ██████████████████████████████████████████████████████. *E.g.*, MR ¶¶ 36, 38-39, Att. C-8 (updated); BD1 at 31:10-32:9.  ████████████████████████████████████. UB § XIII.  ████████████████████ ████████████████████████████████████████ *E.g.*, BR1 ¶ 133.  ████████████████████ ████████████████████████████████████████████████████████████████

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

6672664

████████████████. BR1 ¶ 133; Agmt. ¶ III.B.  Moreover, a licensee cannot avoid its royalty obligations by simply outsourcing parts of the manufacturing process to other companies.  GR ¶ 48 ████████████████

████████████████████

████████████████████ [27]

## X.    UTC BREACHED THE AGREEMENT BY REFUSING TO PAY ROYALTIES FOUND OWING IN KPMG'S FINAL AUDIT REPORT

UTC's assertion that it does not owe the amount set forth in the final audit report (UB § XIV) is legally incorrect and factually disputed.  KPMG audited UTC pursuant to Section XI.A of the Agreement, which provides that ████████████████ and requires UTC to ████████████████.  Agmt. ¶ XI.A.  KPMG issued a final audit report finding ████████████████ DHH Ex. V at 052.  UTC has failed to pay the ████████ audit finding as the Agreement requires.  *E.g.*, Agmt. ¶ XI.A; TR § 2.2.7.; MR § 3.5; GR ¶ 94.

UTC's purported disagreement with the audit report fails from the start because the Agreement explicitly provides that ████████████████ – period.  Agmt. ¶ XI.A.  *See also, e.g.*, GR ¶ 94.  The Agreement does not permit UTC to second-guess the auditors' findings or to decide not to pay royalties found owing by the auditors for any reason, let alone UTC's unilateral (and incorrect) determination about whether the auditors reached correct findings (they did).  *E.g.*, Agmt. ¶ XI.A; GR ¶ 94 ████████████████ TR ¶ 130 ████████████████

████████████████

████████████████

████████; Ex. 34 at 132:10-133:8 ████████████████

---

[27] Tessera objects to the following UTC evidence: (1) Hsu Decl. ¶ 4 on grounds of lacking foundation, the best evidence rule, and that Ms. Hsu disclaimed knowledge of this subject (*see* Section IX.A); (2) Keng Decl. Ex. A on the grounds that it is unauthenticated; (3) attorney arguments in place of expert opinions asserting that prior art discloses every element of the patents (*see* Sections IV & VIII); (4) UTC's attempt to rely on passages from prior art never specifically identified by UTC as relevant to invalidity.  Patent L.R. 3-3 & 3-6.  *See* Sections VIIIA-D.

IRELL & MANELLA LLP
A Registered Limited Liability
Law Partnership Including
Professional Corporations

6672664

Ex. 35 at 162:9-21 When asked during deposition whether UTC has a different understanding of the Agreement's finality provision, UTC's counsel instructed UTC's corporate representative not to answer. *E.g.*, Ex. 36 at 156:4-157:2.

Moreover, even if UTC were permitted to challenge the auditors' findings (which it is not), its substantive criticisms of those findings are incorrect and are mired in factual questions. For example,

. UB at 25.

. *E.g.*, *id.* at 056; TR ¶¶ 106, 109; Ex. 37 at 272:14-21, 286:9-288:11 (KPMG: "

UTC's assertion is also contradicted by both parties' accounting experts. *E.g.*, TR ¶¶ 119-124

Regardless,

**CONCLUSION**

Tessera respectfully requests summary judgment that (1) under *Shell Oil* UTC's validity arguments are not a defense to UTC's pre-challenge royalty obligations; and (2) UTC's patent misuse argument fails as a matter of law. The Court should deny UTC's summary judgment motion.

Dated:  January 21, 2016

Respectfully submitted,

IRELL & MANELLA LLP

By:      /s/ Joseph M. Lipner
         Joseph M. Lipner

*Attorneys for Plaintiff Tessera, Inc.*