# Exhibit 21

# To The Declaration of Richard W. Krebs

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
SAN JOSE DIVISION

TESSERA, INC.,

    Plaintiff,       CASE NO.  CV-10-4435-EJD

    vs.             SAN JOSE, CALIFORNIA

UTAC (TAIWAN) CORPORATION,   February 19, 2015

    Defendant.      Pages 1 - 145

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE EDWARD J. DAVILA
UNITED STATES DISTRICT JUDGE

A-P-P-E-A-R-A-N-C-E-S

FOR THE PLAINTIFF:   IRELL & MANELLA LLP
             By:  JOSEPH M. LIPNER
                  BENJAMIN HATTENBACH
                  DOMINIK SLUSARCZYK
                  JACKSON S. TRUGMAN
             1800 AVENUE OF THE STARS, SUITE 900
             LOS ANGELES, CALIFORNIA 90067-4276

FOR THE DEFENDANT:   KING & SPALDING LLP
             By:  MICHAEL HEAFY
             601 SOUTH CALIFORNIA AVENUE
             PALO ALTO, CALIFORNIA 94304

             CLEARY, GOTTLIEB, STEEN & HAMILTON LLP
             By:  DAVID H. HERRINGTON
                  JACOB JOHNSTON
             ONE LIBERTY PLAZA
             NEW YORK, NEW YORK 10006

(APPEARANCES CONTINUED ON THE NEXT PAGE.)

OFFICIAL COURT REPORTER:   IRENE L. RODRIGUEZ, CSR, CRR
                         CERTIFICATE NUMBER 8074

Proceedings recorded by mechanical stenography,
transcript produced with computer.

UNITED STATES COURT REPORTERS

---

A P P E A R A N C E S: (CONT'D)

ALSO PRESENT:     TESSERA
             BY: MICHAEL C. SPILLNER
               SRIRANGA VEERARAGHAVAN
             3025 Orchard Parkway
             San Jose, California 95134

             UNIVERSITY OF ARKANSAS
             BY: RICHARD K. ULRICH, PH.D.
             3203 BELL ENGINEERING CENTER
             FAYETTEVILLE, ARKANSAS 72701

UNITED STATES COURT REPORTERS

---

San Jose, California         February 19, 2015

P R O C E E D I N G S

(Court convened.)

THE CLERK: Calling case number 10-4435, Tessera, Inc., V. UTAC corporation. On for tutorial and claim construction hearing.

Counsel, please come forward and state your appearances.

MR. LIPNER: Good afternoon, Your Honor. Joseph Lipner of Irell & Manella for plaintiff Tessera. Along with me also from Irell & Manella is Ben Hattenbach, Dominik Slusarczyk, and Jackson Trugman.

And here in the courtroom representing Tessera is Michael Spillner and Sriranga Veeraraghavan.

THE COURT: Thank you very much. Good afternoon. Please be seated. Thank you.

MR. HERRINGTON: Good afternoon, Your Honor. David Herrington of Cleary, Gottlieb, Steen & Hamilton for UTC and with me is my colleague Jacob Johnston.

And Michael Heafy from King & Spalding.

And Richard Ulrich recently retired a couple of months before from the University of Arkansas.

THE COURT: All right. Welcome everyone. I have to confess, it is a bit of a unique type of a claims construction hearing. This is -- I just want to clarify again to confirm that nothing has changed since the last time I looked at the

UNITED STATES COURT REPORTERS

---

pleadings.

This is a breach of contract case.

MR. LIPNER: That is correct, Your Honor. And in light of Your Honor's interpretation of the contract, we are holding a claims construction hearing.

THE COURT: And that claims construction hearing, I do have a couple of questions, observations, I guess, I would make. It's a claim construction hearing to, I suppose, assist the court in determining in some manner what the agreement was about if I could put that in delicately.

This is not a classic claims construction hearing that, as I understand it and would expect, would have any Res Judicata effect here on the patents per se such that the federal circuit might have some say in what happens this afternoon. Let me put this that way.

This is purely, based on the contract as I understand it, I think you both agree that the companies, when they sign a contract, the California law would be determinative here. And as far as I know the federal circuit and California are a couple of different things.

But is that a fair observation?

MR. LIPNER: I think in general it is, Your Honor. There are parts of your observation I haven't thought about including the Res Judicata issues.

I do think it is correct as we've have observed that this

UNITED STATES COURT REPORTERS

if we can pull up slide 7.

And, again, the most important sentence here is the first sentence. The rest, again, we believe it should be included because it's helpful in distinguishing more clearly, more specifically what the movement is.

Most important is the first sentence. And this is Tessera's sentence. Again, it doesn't like it anymore, but it's Tessera's sentence.

What did it say in the federal circuit? It says, this is the second bullet point, following a long line of cases that have done the same, the I.T.C. adopted the following construction for the movement limitations. The construction carefully grounded on the intrinsic and the extrinsic evidence is the following. I could read it, but it's exactly the same as our first sentence.

So this is what Tessera said -- and this goes against all of these things like movement. Everyone knows what movement is. Why define it? That is not helpful to the jury. That is a mouthful, for sure. But that's their invention. They don't get to say that will confuse the jury so don't limit me to my invention. If that's their invention, that's what the claim construction has to be.

So let me now show that this is the same claim terms in the specifications in the foreign patents that are at issue in this case.

UNITED STATES COURT REPORTERS

If I could have 31, please. This is the claim that Tessera was discussing in that federal circuit brief. And by the way, the federal circuit endorsed their construction. And the claim term is that "wherein said terminals are moveable with respect to said chip."

You have the next slide. This is the '438. This is one of the foreign Khandros patents at issue in this case. "terminals being moveable with respect to said chip."

You have the next slide. '374, another Khandros patent in this case. "Said terminals are moveable with respect to said chip."

Next slide. The '923. "And the terminals are moveable with respect to the semiconductor chip."

If we can have the next one. '709. "And said assembly includes a flexible means that enables said terminals to move towards said chip."

Exact same limitations. Again, the linkage between flexible and movement.

The patents have the same -- these foreign -- we all know what a foreign counterpart is. You come up with an invention and you go down to the patent office and you apply for a patent. And then you say I'd like to get the same patent overseas and you apply the same application for the same invention overseas. It's the same invention.

You know, Tessera is saying, well, but maybe Korea does

UNITED STATES COURT REPORTERS

things differently. It is the same invention and has the same specifications.

If you can look briefly at slide 25.

This is the '326. And this is the patent at issue in the federal case that we just looked at where Tessera said movement means.

The inventors are Mr. Khandros and Mr. Distefano. The application data and you see it traces back to 586,758 and 673,020.

We have the next slide. The next slide is '419 and the same inventors that were also involved.

Next slide. So this is the first of the foreign Khandros patents, and you'll see the inventors and that's 72 in the bottom left-hand column Mr. Khandros and Mr. Distefano. And the same patent applications that we saw on the U.S.

We can go quickly through 28. Same thing for the Canadian patent and same inventors and same inventors.

'923. Same applications and same inventors.

The next. Korean patents. Same patents, same inventors, and same specification.

So let's go back to what Tessera again has said these patents are about in support for its construction of the movement limitation.

Can I have slide 20, please. Tessera said, what is the problem to be solved? This is slide 20. The core problem

UNITED STATES COURT REPORTERS

addressed by Tessera's patents is the effect of differential thermal expansion, what they call DTE.

And they say, what are our patents about?

Tessera's patents and their paradigm shift.

"Tessera's asserted patents disclosed a new way to minimize the problem of stress and strain associated with the CTE mismatch between chips and organic PCB's, using structures inside of the package to absorb at least some of the strain that would otherwise be absorbed by the solder balls. The preferred structure includes a compliant layer with a package that effectively decouples the chip from the package substrate and absorbs stress resulting from differential thermal expansion." And here's the key about the allowing the movement: "Such layers allow relative movement of the package terminals and the absorbed strain within that compliant material rather than in the fragile solder balls."

So this is Tessera trying to support its limitation and its construction of movement. I think that's what these patent are all about.

If we could have slide 24. The federal circuit said that's right, that's what these patents are all about. I'm not going to read all of that first paragraph, but it's saying the same thing and it is towards the bottom. "This relative movement causes mechanical stress of the solder balls, repeated, repeated cycles of heating and cooling can lead to

UNITED STATES COURT REPORTERS

129

The issue here in our construction or the thing that Tessera was quarrelling with is the fact that the chip carrier before you even connect it to the leads on the chip -- let me just back up. The chip carrier has terminals and leads and electrical connections with the terminals.

The text on the right is claim 1 and the first indented language is "providing a flexible chip carrier having a top surface and a bottom surface with terminals disposed on said top surface and leads in electrical connection with said terminals."

So that's what the claim says that the chip carrier has to have. It has to have the terminals and the leads and the electrical connections with the leads on it.

That's not a step. It's not saying first get yourself a chip carrier and the later step in the claim says and then add some leads and then the later claim says and then add some terminals. It says provide a chip carrier that has these things on it.

And in the second step is what are you going to do with it? You're going to place it above the chip and create a gap. Well, that's a separate step, and we can talk about the order of those things. I don't think you can create the gap unless you have the thing that you're holding above the chip.

But this isn't the question of sequencing or anything else. This is what the patent says that the chip carrier must

UNITED STATES COURT REPORTERS

130

have. The patent claim. So that's all our construction is doing is saying the chip carrier has to have that before anything else happens to it.

Now, by the way, Tessera says, oh, but you also want to add into the construction that it has a dielectric layer on it.

Frankly, if they had properly supported that, that might have been a valid argument. They didn't. They just made attorney argument that it has a dielectric layer. And their argument is, oh, if it doesn't have a dielectric layer, it's going to short circuit. Well, basically it won't do its job.

They like that idea for the dielectric layer on the chip carrier but for some reason when it applies to liquid, they have admitted, for example, liquid, if you put water in the package, the water is a liquid under the standard dictionary meaning. And what would be known to young children, Kool-Aid is a liquid, orange juice is a liquid, all of those things would destroy a package.

So when we tried to construe liquid, we tried to be faithful. It's not just any old liquid. It has to do something and operate within the context of the invention and work.

So it's interesting that Tessera says, no, we want to construe liquid so that water would be liquid because it would be improper to exclude water. That -- the invention can't be read to construe liquid without saying, well, what is liquid in

UNITED STATES COURT REPORTERS

131

the context of this semiconductor chip package and this claimed invention?

On that, Your Honor, liquid appears in the '611 and the '952. The '611 says at the very beginning that this is about packages that have an elastomeric layer and an elastomeric layer is what is formed from the liquid. And that elastomeric layer provides resilience and that resilience is discussed numerous times over and over in the patent.

So what is a liquid? We didn't even say it has to be elastomeric. I think we could have argued for that. We said at the very least it has to define resilience because that's what the patent was talking about. And Dr. Ulrich discussed that as well and that would be what was known to one of skill in the art.

Your Honor, I have one more minute on my clock. I'd be happy to answer any questions you might have.

THE COURT: No. Thank you. And if you have anything else to say now. I am going to give you a summation if you would like.

MR. HERRINGTON: There are other claim terms that we haven't touched on, and we do address them in our brief. And I would like to say more.

THE COURT: All right. Thank you very much.

MR. HERRINGTON: Thank you, Your Honor.

MR. HATTENBACH: So, Your Honor, he did go back and

UNITED STATES COURT REPORTERS

132

the other term he addressed was the one I skipped, and if I could address those briefly.

THE COURT: Sure.

MR. HATTENBACH: They went back to moveable. And they had now four opportunities to address the term and you still have not heard one iota of information about the applicable foreign law or the facts of the prosecution history of the foreign patents. And you recall it was the facts of the prosecution history of the different U.S. expired patents that resulted in that moveable construction that they like. Those facts don't exist with respect to the foreign patents.

So even if foreign law allows you to narrow claims in this manner based on prosecution history, there is no prosecution history that would lead you to that result here. The Lin patent, as far as we can tell, was not even addressed during those foreign prosecutions. They've had four chances to address those points. I don't know that I could throw down the gauntlet any more clearly and they remain unaddressed.

Let's go on to chip carrier -- well, I guess just one more point on that, which is counsel said that if we don't like their construction, what Your Honor can do is add in the testing and planarization embodiments into the claim as well. You'll recall that there are at least three totally separate reasons to have compliant layers and moveability. Those are two of the others that are given as examples in the patent.

UNITED STATES COURT REPORTERS

the others, they say the field of the invention is to provide a compliant interface to alleviate stress from CTE mismatch. So if you're not within the field of the invention, if you're not addressing CTE mismatch and alleviating it, how in the world are you faithful to what this invention is? You're in a whole another ballpark. This ballpark is addressing CTE mismatch. That's the field of the invention.

And then the background says there have been a lot of ways to do it, and we're going to try to improve on Khandros. That's what it says. That's what other people have done. Improvements on this issue would be desirable.

And then it says, and here is our improvement. The very first thing it says in the summary of the invention it says here's our idea for failing CTE mismatch. And yet if Tessera had its way, CTE mismatch would be nowhere to be found in the claims, and these claims would read on things that have nothing to do with CTE mismatch.

That is absolutely contrary to what these inventions are.

And the Phillips case talked about why it is that you can't just give standard dictionary meanings. You have to give the meaning that something like Dr. Ulrich would understand after he reads this patent and he says, okay, I see, you're claiming that you're dealing with CTE mismatch. And what that means is you're alleviating the stress and producing better reliability. I understand, and we all know that is the problem

UNITED STATES COURT REPORTERS

in this field and we know what it means to address that.

THE COURT: Well, how much information do you need to give to a person of skill in the art? The presumption is that they're skilled in the art.

MR. HERRINGTON: Understood. And the presumption is that if an engineer walks into your office and says I've got this great design, this great feature that is going to address CTE mismatch, what that means and what these patents say is that you're alleviating the stress from CTE mismatch.

That's what they are claiming. That's what these patents are all about. And yet every single one of their approaches to the claim terms has nothing to do with CTE mismatch. They want to read their claim terms so that they have nothing to do with that and they would cover something that itself doesn't have anything to do with CTE mismatch.

THE COURT: I think the, the -- very generally, just general observation, 30,000 feet, it appears that Tessera is saying right, okay, I know the task for all of us to talk about on a Thursday afternoon, but UTAC seems to -- they're looking at this and Hemingway type of prose. They're going way too far.

MR. HERRINGTON: That's great. And that's exactly what Tessera's counsel says Hemingway type prose. It's not Hemingway type prose. Every single -- every construction we use uses the text verbatim from the patent for how they can

UNITED STATES COURT REPORTERS

define the invention. We did not make it up, and we couldn't make it up.

THE COURT: Sure. They're saying do we need Hemingway when E.E. Cummings would do?

MR. HERRINGTON: Your Honor, the reason we need Hemingway because the reason we need Hemingway, and this is what the Phillips case emphasizes, it says, "the patent system is based on the proposition that claims cover only the invented subject matter."

So if your inventive subject matter is addressing CTE mismatch, you can't read the claims so that they don't address that, and you can't leave the poor jury who has never heard of CTE mismatch to say that I guess liquid means water, I guess it means a ham sandwich because you're being standoffish today. You know, we all know what that means. That's not what claim construction is.

Claim construction is that you have to read the claims to cover the subject matter of the invention. That's what these inventions do. The texts or words don't come from us, they come from the patents. And the fact that you have to cover this role of these features, that comes from the patents, it comes from the field of the invention, the background of the invention, the summary of the invention.

It doesn't come from the section that we call the preferred embodiments. Let me show one way of doing it. Let

UNITED STATES COURT REPORTERS

me show another way of doing it. It comes from the things that say this is the invention. This is the field of the invention. The field of the invention is what are we going to do about CTE mismatch?

So, yeah, a jury, they're going to have to do some learning to understand what a CTE mismatch is, that's for sure. And when they get the claim construction that says you're dealing with CTE mismatch, they'll need some help from the experts saying this is what it is. It's actually not that complicated but they will need to understand that.

Yeah, it would be a lot simpler if they never heard about CTE mismatch and it's all about ham sandwiches. But that's not what claim construction is because that would let the inventor have a claim read on something that is not the invented subject matter.

So that's what this is about, Your Honor.

THE COURT: Okay. Great. Thank you very much.

MR. HERRINGTON: Thank you.

THE COURT: Matter is under submission, and let me extend my thanks to you also. It's always a pleasure to have you in the courtroom. And so I appreciate your assistance here, and the matter is under submission.

MR. HERRINGTON: Thank you, Your Honor. And we would thank your staff. It's been a long day.

MR. LIPNER: Thank you.

UNITED STATES COURT REPORTERS

(Court concluded at 5:15 p.m.)

UNITED STATES COURT REPORTERS